**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **DEMARKUS TAYLOR,** | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:20-cv-00936** |
| | ) | **Chief Judge Crenshaw / Frensley** |
| **BRIAN ELLER,** | ) | |
| **Respondent.** | ) | |

## REPORT AND RECOMMENDATION

Petitioner DeMarkus Taylor was convicted by a jury on July 30, 2015, for two counts of aggravated child abuse, two counts of felony murder, and one count of false reporting. Docket No. 23-1, p. 1. Petitioner received an effective life sentence and filed a timely appeal to the Tennessee Court of Criminal Appeals. *State v. Taylor*, No. M2016-00255-CCA-R3-CD, 2017 WL 781733, at *8 (Tenn. Crim. App. Feb. 28, 2017), *perm. app. denied* (Tenn. May 18, 2017). The Tennessee Court of Criminal Appeals affirmed the convictions. *Id.* at *12. The Tennessee Supreme Court subsequently denied permission to appeal. Docket No. 23-17.

On August 14, 2018, Petitioner filed a pro se petition for post-conviction relief, which was denied by the post-conviction court as untimely. Docket No. 23-18, pp. 5, 95-96. On appeal, the Tennessee Court of Criminal Appeals affirmed the dismissal of the pro se petition. *Taylor v. State*, No. M2019-02020-CCA-R3-PC, 2020 WL 4332531, at *1 (Tenn. Crim. App. Jul. 28, 2020), *perm. app. denied* (Tenn. Nov. 12, 2022). The Tennessee Supreme Court denied permission to appeal. Docket No. 23-29.

Having sought relief in state courts, Petitioner now brings his claims to federal court under 28 U.S.C. §§ 2241 and 2254, alleging that errors committed in his state proceedings violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments, as well as Article I, § 9 and

Article III of the United States Constitution. Docket No. 18, p. 1. Petitioner also requests an evidentiary hearing. *Id.* at 1, 9.

For the reasons set forth below, the Undersigned recommends that Petitioner's amended petition for habeas relief be **DENIED** and **DISMISSED WITH PREJUDICE**. The Undersigned recommends that a certificate of appealability be **DENIED** as to all claims. Per § 2254(e)(2) and *Shinn v. Ramirez*, the Undersigned further recommends that the Petitioner's request for an evidentiary hearing be **DENIED** as to all claims. *See* 142 S. Ct. 1718, 1734 (2022) (quoting 28 U.S.C. § 2254(e)(2)(A)(i), (ii)).

## I.    BACKGROUND

In deciding Petitioner's appeal from his conviction, the Tennessee Court of Criminal Appeals summarized the factual basis of this case[1]:

> [E]mergency personnel responded to a call at the residence of the Defendant and his co-defendant, Rawny Taylor. The call was made at approximately 2:56 p.m. on July 12, 2013 and regarded a four-year-old child who was not breathing. Christopher Shoemaker, a volunteer firefighter[,] arrived on the scene first. The Defendant met Mr. Shoemaker as he arrived at the trailer and led him inside. Upon entering the trailer, Mr. Shoemaker walked to a back bedroom and observed the Defendant's four-year-old daughter, A.T., lying on a bed, covered by a blanket up to her chin. Mr. Shoemaker checked the victim for a pulse, but he did not find one. Additionally, it appeared that rigor mortis had set in because the victim "was stiff and cold[,]" according to Mr. Shoemaker. He observed that there was a "small amount of blood in her nostril and on the edge of her lip." After making these observations, Mr. Shoemaker did not believe that lifesaving measures would be able to help the victim, and he informed the Defendant "that there was nothing [he] could do."
>
> Mr. Jerry Buchanan, who worked for Woodlawn Volunteer Fire Service and Clarksville Fire and Rescue, explained that he was a medical first responder and that he arrived at the trailer following Mr. Shoemaker. In the trailer's back bedroom, he observed that the victim had blood on her right nostril and lip. After Mr. Shoemaker

---

[1] The Court will refer to any minors involved in the case by their initials.

informed him that the victim "was cold to the touch and rigors had set in[,]" Mr. Buchanan cleared the residence and did not allow anyone else inside.

Mr. Danny Cotterell also responded to the emergency call. He testified that he was employed as a shift lieutenant with Montgomery County Emergency Medical Services, and his duties included being responsible for daily supervision of his shift, responding to critical calls, and acting as a Deputy Coroner for the County Medical Examiner. As a Deputy Coroner, he completed the initial coroner's report and sent it to the County Medical Examiner.

Upon entering the bedroom, Mr. Cotterell "pulled the blankets back a little and reached down and touched [the victim]." He observed that the victim "had rigor mortis[,]" which meant that "there [was] nothing [they] could do any longer to attempt to resuscitate." He explained that he saw "some blood coming from her nose and blood on her lips[.]" He further examined the body for the purposes of the coroner's report and found "bruising on the right side of [the victim's] face[,]" "bruising on her chin[,]" and "bruising on both arms." He also observed a "wound or bruise on her chest." When Mr. Cotterell touched the victim's head, he felt "a depressed area of the skull behind her right ear…[t]oward the back of her head."

Mr. Cotterell left the bedroom and spoke to Ms. Taylor, the co-defendant and the victim's mother, regarding the victim's medical history. Ms. Taylor told him that she had checked on the victim the night before. She heard the victim's snoring but believed that she was sleeping well and left her alone. The Defendant told Mr. Cotterell that he put the victim to bed early the night before because she had been misbehaving. The Defendant said that sometime later the victim came out of her room and told the Defendant that her head was hurting. The Defendant felt her head but claimed he did not feel any bumps, so he sent her back to bed.

Deputy Shanna Grice was a patrol officer with the Montgomery County Sheriff's Office and testified that she was working on July 12, 2013, and responded to the call regarding a four-year-old, non-responsive child at the Defendant's residence. Upon looking into the bedroom, she observed the victim lying "in a position that was not very natural and [she] noticed…bruising on [the victim's] left arm." Deputy Grice went back outside and secured the residence. She asked both parents and the two other children to remain in the front right bedroom of the trailer away from the victim's room. During this time, the Defendant did not appear to be very emotional and Ms. Taylor cried and "was…very upset."

Mr. Michael Allen Mason testified that he was neighbors with the Defendant and his family. He lived in a mobile home on a nearby lot and was able to see the Taylor's [sic] home from his own. Mr. Mason explained that he had known the Defendant and Ms. Taylor for about ten years. He testified that, at approximately 9:30 or 10:00 a.m., on the morning of July 12, 2013, he returned home from work to retrieve something he had forgotten. From Mr. Mason's home, he observed the Defendant and Ms. Taylor sitting outside on the back steps of their trailer and claimed that "it seemed as though one were consoling the other."

On cross-examination, Mr. Mason was asked by the co-defendant's counsel if he had "personal knowledge that [the Defendant] ha[d] sold marijuana in the past?" Counsel for the State objected to the relevance of the question, and the Defendant's counsel objected and requested a mistrial arguing that the question was overly prejudicial and that it could not be cured by a curative instruction. The objection was sustained. However, the court denied the request for a mistrial but instructed the jury to disregard the question.

Investigator Jeff Morlock worked with the Criminal Investigations Section of the Montgomery County Sheriff's office [sic] and testified that he was involved with the investigation of this case. Investigator Morlock assisted in interviewing the Defendant at the scene, took photographs of the scene, and searched inside of the residence. The Defendant voluntarily made a statement to Investigator Morlock. The Defendant wrote out his statement and signed it, which Investigator Morlock identified and read into the record:

> Yesterday, my kids had started acting up, doing nasty things with each other. Then I had to split them up by putting [the victim] in her bed and my son on the couch with time out. After I walked out of the room, [the victim] had come out and told me that she had hit her head. So I felt her head for knots and there wasn't any. I told her to lay down and you will be okay. After that, we made some dinner for the kids. [The victim] would not wake up but she was breathing and snoring. We just figured that she was tired, so by 11:30 or 12:00 we had made all the kids go to bed and [Ms. Taylor] and myself went into the room to give them all a kiss and [the victim] was snoring and breathing good. So we checked on her again before we went to sleep and she was doing the

> same thing so we just figured she was tired. My wife woke up the next…afternoon and checked on her and then she run back into the room with me and she said she was cold and not breathing. I jumped out of the bed, ran into the room and shook her a little bit to try and wake her up. She didn't get up and then I called.

Also, Investigator Morlock identified photographs he had taken of the Taylor residence.

Investigator Joshua Wall testified that he was an investigator with the Montgomery County Sheriff's Office. Mr. Wall stated that on July 12, 2013, he responded to the Taylor residence at approximately 4:30 p.m. His duties included searching the area and taking photographs of the scene. Mr. Wall identified photographs that he took of the inside and outside of the trailer. He observed that the bedroom in which the victim was located had three beds, two of which were unoccupied, and one on which the victim was lying. While in the room, he took photographs of the victim on the bed. He identified multiple photographs he had taken of the victim, and they were entered into evidence.

Investigator Mark Wojnarek testified that he was a criminal investigator with the Montgomery County Sheriff's Office and that he responded to the scene at the Taylor residence on July 12, 2013. He was working as a supervisor, and his duties included directing personnel and crime scene technicians, assigning a lead investigator, and watching the body. Later in the investigation, Investigator Wojnarek conducted an interview with the Defendant at the jail. Investigator Wojnarek identified a partial recording of the jail interview, and the recording was entered into evidence.

Mr. Norman Ray Clark, III, a custodian of records with Sprint, testified to verify Ms. Taylor's telephone records. Mr. Clark identified a copy of a record maintained by Sprint for the telephone number 931-302-3179. The account holder for this telephone number was Ms. Taylor. The record showed incoming and outgoing calls "and text messages with the appropriate date and time as well as the numbers that [were] in communication with one another." Based on his review of the Sprint document, there were three incoming calls in the morning on Ms. Taylor's telephone before the telephone was used to call 911. The first and third calls were unanswered, but according to the length of the second incoming call, it was answered.

Investigator Julie Webb was a criminal investigator employed with

5

the Montgomery County Sheriff's Office and helped investigate this case. On July 12, 2013, she responded to the call at the Defendant's residence, and spoke with Ms. Taylor. Regarding the day before, Ms. Taylor informed Investigator Webb that she had left her residence for work at 9:30 a.m. The Defendant and their three children, M.T., A.T., and D.T., were still asleep. She returned home from work at 7:30 p.m. and stated that the victim was in bed at that time. She tried to wake the victim for supper, but she would not wake up and was snoring loudly. Ms. Taylor acknowledged that it was unusual for the victim "to snore like that, that loudly." After dinner, D.T. "went to sleep on the couch[,]" and M.T. "went into the bedroom…and [Ms. Taylor] started a movie for her." When the children were in bed, "she and her husband took a shower together, they put on lotion." Around midnight, Ms. Taylor checked on the victim again and "she was still snoring loudly, she had never woken up[,]" and Ms. Taylor "kissed her" and then "went to sleep herself." Ms. Taylor told Investigator Webb that she and her husband woke up late on July 12, 2013. Two of their children had come in for breakfast, but the victim had not joined them. Ms. Taylor went to check on the victim and found her cold and nonresponsive. Ms. Taylor ran down the hall and screamed for her husband. Ms. Taylor put her statement in writing. Investigator Webb identified it, and it was entered into evidence.

On July 12, 2013, Investigator Webb also entered the Defendant's residence and went into the room in which the victim was found. She observed "a very small little girl laying on top of the bed and she was deceased." The victim had "bruising on her left arm[,]" "discoloration on her face[,]" "blood around her nostrils, and her mouth had what appeared to be like teeth marks and it…had blood on it."

Investigator Webb also spoke with Ms. Taylor on August 6, 2013. On that date, Ms. Taylor admitted that she and the Defendant had not been truthful about the time of day that they discovered the victim. They found the victim on the morning of July 12, 2013, and Ms. Taylor was afraid to call the 911 and decided not to call at that time. In this interview, Ms. Taylor also admitted that she and the Defendant waited five hours before calling 911.

M.T., the victim's older sister who was eight years old at the time of trial, testified about the events surrounding the victim's death. M.T. testified that her "birth parents" killed the victim. She claimed that from her bedroom, she saw "them hurting [the victim] in the bathroom." When asked how the victim was being hurt, she responded, "By getting beatings." M.T. claimed that the Defendant

beat the victim "[w]ith his hands sometimes" and "sometimes a belt." Her mother was at work when this happened. M.T. stated that she shared a room with the victim and their brother. After seeing the victim in the bathroom, M.T. saw the victim return to their bedroom and get in bed. When their mother returned home from work that evening, the victim was still in bed. She explained that the last time she saw the victim, the victim was in bed and she "was all blue and her teeth were blue and stuff." When M.T. saw that the victim was blue, she attempted to wake her, but the victim did not respond. When she could not wake the victim, she told her parents. Her parents went in the bedroom to check on the victim, and M.T. and her brother sat on a couch in another room. M.T. explained that her parents did not call for help right away.

Dr. Adele Lewis was a forensic pathologist at the Medical Examiner's Office in Davidson County and offered expert testimony regarding the autopsy she performed on the victim on July 13, 2013. The victim's date of death was July 12, 2013, and Dr. Lewis made the following observations regarding the victim's head: The victim had a bruise on her right ear, a "black bruise on her right cheek[,]" and a "brownish yellow bruise on her left cheek." There were "two black bruises with some scrapes on top of those" on the left side of the victim's jaw, and there was a scrape on the underside of her chin. She also observed that the "left side of her neck had several pinpoint hemorrhages about two by two inches in total area."

Dr. Lewis also discussed her findings regarding the inside of the victim's head. First, she removed the skull and examined the brain. She found "some bruises and some scalp bruises on both sides of the top of the victim's head." There was a "deep scalp bruise on the back of her head." The victim had a "subdural hemorrhage[,]" which meant that she had bleeding under the covering of the brain. There was also bleeding on the right side of the brain. Dr. Lewis further observed "bruising and bleeding inside the back of [the victim's] neck where [the] spinal cord connected to [the] head and there was bleeding on top of the spinal cord itself." Dr. Lewis explained that there should be no blood on the brain. The brain should be a "pink/tan color" without any bleeding. The victim's brain "was red and bloody and had blood clots on it."

When asked what sort of injury could have caused this, she responded that this is the sort of injury suffered after a child was shaken. Also, in the victim's case, there was evidence that her head hit an object or an object hit her head. She explained that this was how deep scalp bruises occurred and how the victim likely obtained the bruises on her face. Dr. Lewis claimed that a four-year-old would

not have the necessary strength to inflict such injuries herself. Regarding the types of injuries the victim had, Dr. Lewis "would expect to see in someone who ha[d] been in a major car crash or who had fallen two or three stories out of a building."

Dr. Lewis testified that she observed more injuries to the victim's head. She explained that when the brain is injured it begins to swell, and when the brain swells, it cuts off blood supply to the brain. She observed that the victim "had a very swollen brain." She also noted that the victim "had bleeding in the nerves that connect [the] eyeballs to [the] brain and also bleeding inside the backs of her eyes." She stated that bleeding inside the eyes was "indicative of child abuse." Also, Dr. Lewis testified that the type of injury necessary to cause the victim's spinal cord injury required "a very violent amount of force." It was caused by a "whiplash type injury" or "being struck in the back of the head."

In addition to observing the victim's injuries, Dr. Lewis also noted that the victim had a shunt in her head. She explained that "a shunt is just some tubing that a neurosurgeon can insert in order to drain a fluid collection either in the brain or on the brain." She stated that the shunt in the victim's head was working because it had drained blood from her brain down into her abdomen.

Dr. Lewis also found injuries to the victim's abdomen. She observed that

> on the upper part of [the victim's] chest, she had two yellow brown bruises, one of about a quarter of an inch in diameter and one [was] about three-quarters inch in diameter. The upper part of her abdomen had a one quarter inch in diameter bruise and scrape. The right side of her abdomen had another one quarter inch in diameter purple scrape and bruise. The left side of her abdomen had a two inch complex or group of brown bruises that were about one quarter inch in diameter each. The left side of the lower part of her abdomen or stomach had two brown bruises between three-quarters inch and one and one half inches each. There was some bleeding into the fat underneath the skin associated with that, that was near her left hip.

Dr. Lewis described the following injuries she found on the back side of the victim's torso:

> on the right side of the upper part of her back, near

the right shoulder, there were two blue bruises of a
quarter inch to one half inch in diameter. The right
side of the middle of her back had a scrape and a
bruise that also had some hemorrhage into the fat
underneath the skin. The right buttocks, on her butt
cheek basically, had an area that was about three
inches in overall dimension. It was linear or line-like,
a raise of pinpoint hemorrhages with a clear area in
between those areas of pinpoint hemorrhage.

…

[O]n the right buttock, there were two brown
contusions or bruises and two yellow brown bruises
which means that they were at least forty-eight hours
old. On the left buttock, there were again two yellow-
brown bruises and also, on the left buttock, there was
a one and one half inch in length sort of semi-circular
purple bruise and that also had bleeding into the fatty
tissues underneath the skin.

Dr. Lewis explained that the types of bruises she found on the victim
were not likely obtained during normal, everyday activity.
Additionally, Dr. Lewis found that "[t]here was a broken rib, the
back of the right ninth rib, sort of in the middle of the back, had a
healing fracture but also had a fresh or acute fracture through that
healing portion of the rib." She explained that such rib fractures
were "particularly suspicious for inflicted injury." Following this
testimony, Dr. Lewis identified and described multiple photographs
taken of the victim during the autopsy, including photographs of the
victim's brain and eyes. They were entered into evidence without
objection.

Dr. Lewis testified about the victim's snoring prior to her death. She
explained "that kind of snoring, that kind of loud kind of breathing
and gasping and pauses between breaths [was] called agonal
breathing and that means, it's the way someone breathes right before
they die." She stated, "it would [have been] clear that something was
very wrong with the [victim]." Agonal breathing does not produce
the same sound that snoring produces, and she claimed that it could
not "easily be mistaken for snoring." She also testified that when a
person is having this type of breathing, "some fluids build[] up in
the lungs and especially when a person has a head injury, there are
also chemicals that get released in the body and that also creates
fluid on the lungs." Additionally, agonal breathing is "coupled with
a state of unconsciousness."

9

Overall, Dr. Lewis testified that she suspected the injuries the victim suffered were the result of child abuse. She determined that "multiple blunt force injuries" caused the victim's death, and the manner of death was homicide. The circumstances surrounding her death indicated battered child syndrome. She claimed that it was possible the victim may have survived if she had received medical treatment. She determined that there was "no medical or natural causes for [the victim's] injuries." Dr. Lewis based her findings on the multiple injuries of different ages on the victim and the victim's medical history.

The Defendant testified in his defense. On July 11 and 12, 2013, he was at his residence with his wife and three children. Ms. Taylor was working on July 11, 2013, and he remained at home with the children. He got up around 10:30 a.m. and fed his children breakfast. After breakfast, he took them to their shared bedroom and turned on a movie for them. Throughout the day, he checked on the children and changed out their movies. At some point, his daughter M.T. came and told him that the victim and her brother, D.T., were misbehaving. The Defendant claimed that he separated the victim and D.T. by putting the victim on her brother's bed and D.T. on a couch in another room. Shortly after that, the Defendant was back in his bedroom watching television when the victim came into his room crying and told him that she hit her head. The victim held her hand over the right side of her head. The Defendant checked the victim's head "to see if there were any knots[,]" but he did not feel anything. The Defendant sent the victim back to bed "around 5:30 or 6:00 p.m." He said that Ms. Taylor came home at 7:00 or 7:30 p.m. and made dinner, but the victim was "still asleep in her brother's bed." The Defendant claimed that he walked into her room and looked at her. He heard her snoring and believed she was sleeping.

After dinner, the Defendant explained that he returned to his room to watch television, while Ms. Taylor looked after the children. At some point that evening, he took a shower and checked on the victim again because the bathroom was close to her room. He stated that "she was breathing normal and snoring." Also, the Defendant said that he informed Ms. Taylor that the victim had hit her head. Ms. Taylor and the Defendant put the other children to bed around 10:00 p.m. M.T. slept in her bed in the room with the victim, and D.T. slept in another room on the couch because the victim was in his bed. He claimed that Ms. Taylor checked on the victim again at midnight that night and nothing appeared to be wrong. He woke up the next morning at 11:00 a.m. to Ms. Taylor's "crying and screaming,

saying [the victim] was cold in the bed and stiff." He went into the victim's room and confirmed that she was cold and nonresponsive. The Defendant admitted that he did not call 911 right away "because [he] was just…a nervous wreck and [he] didn't know what to do and [he] didn't want [his] other two kids to get taken away from [him]." He claimed that he made no calls before calling 911 and denied instructing Ms. Taylor not to call 911. Ultimately, the Defendant called 911 at 2:56 p.m. The Defendant admitted that he lied to police about the time he found the victim and said that he "tried to make it like [he] called right after [he] found her." He explained that he "just wasn't thinking clearly." Finally, he denied inflicting the injuries on the victim that caused her death.

On cross-examination, the Defendant admitted that he knew the victim was dead when he found her and that he waited five hours before using Ms. Taylor's phone to call 911. The Defendant again denied beating his daughter and claimed that he "didn't see anybody to do it." He confirmed that he was alone with the children all day while their mother was at work and that no one else came into the home. He also testified that Ms. Taylor never hit the children.

Ms. Joyce Blount testified on behalf of Ms. Taylor. Ms. Blount knew Ms. Taylor because they worked together. She confirmed that she and Ms. Taylor worked together on July 11, 2013, and that they both left work at 7:00 p.m.

Ms. Taylor testified in her own defense. She stated that on July 11, 2013, she left for work in the morning while her husband and children were still sleeping. After working all day, she returned home at approximately 7:30 p.m. She explained that when she got home, the victim was in D.T.'s bed, D.T. was on the couch, and M.T. was in the kitchen. The Defendant told her that he had to separate the victim and D.T. because they had been misbehaving. He told her the reason he put her in D.T.'s bed was so that he could see her. Ms. Taylor explained that D.T.'s bed "was the only bed [they] could see from the other room of the house." Before checking on the victim, she began to make dinner for the family. When dinner was ready, Ms. Taylor called the children to come to dinner, but the victim did not wake up. She stated that the Defendant told her the victim had eaten and played and that "she was probably just tired." After walking to the doorway of the children's bedroom, Ms. Taylor heard the victim's "snoring" and believed she was asleep. She did not notice anything wrong with the victim nor did she attempt to physically wake her. After dinner, D.T. returned to the couch and M.T. went into the children's room to watch a movie. Ms. Taylor took a shower and watched a movie in her own bedroom. After the

movie was over around midnight, she checked on the victim again, and Ms. Taylor said that the victim snored occasionally, but she was not "an every night snorer." Ms. Taylor kissed the victim and did not notice any markings on her face. After checking on the victim, she went to bed in her own room.

Ms. Taylor testified that she woke up the next morning around 9:00 a.m. and began to get ready for work. From the bathroom, she looked into the children's bedroom and noticed that the victim "was in the same position she was in when [she] checked on her the night before." Ms. Taylor touched the victim on the arm and discovered that she was cold. She ran back into her bedroom and woke up the Defendant and asked him to check on the victim. Ms. Taylor returned to the room with the Defendant, and she observed that the victim had "a spot of blood on her nose" and that she was covered with a blanket. When she and the Defendant attempted to wake the victim, they realized she was "gone" because "[s]he was cold and stiff."

Ms. Taylor claimed that she told the Defendant they needed to call the police, but he "called her phone to find her phone, collected her phone" and said that they could not call "the police right now because there were things he had to hide." She said that she knew the victim was dead, but the Defendant took her phone and told her not to call the police. Eventually, the Defendant called the police. Ms. Taylor admitted that when Investigator Webb interviewed her that day, she lied about the time she got up. She testified that the Defendant told her that she "was going to tell [the police] that [they] just woke up and [they] just found [the victim] and [they] were calling the police." She stated that the first time she told Investigator Webb the truth was during an interview on August 6, 2013.

Ms. Taylor reiterated that on July 11, 2013, she did not see any injuries on the victim's face. She said that the victim "was asleep in the bed" and she "had no reason to search her or strip her down." After the victim's death, Ms. Taylor testified that the following conversation occurred between her and the Defendant:

> I was downstairs by the pool table, crying and he came downstairs and was pacing back and forth and he was like you gotta quit all that crying. And I was like, I don't know about you, but I just lost a child, I can't help it. He said I just hope this didn't happen when I threw her on the bed and she hit her head[.] I sat up, I said what do you mean when you threw her on the bed and she hit her head? And he said I mean

when she threw herself in the bed and she hit her head, like I told you she did[.]

Ms. Taylor stated that she told Investigator Webb about the Defendant's comment.

On cross-examination, she insisted that she never observed any bruises on the victim's body when she came home from work on July 11, 2013. She stated that if she had known her "child needed any help or there was anything [she] could do, [she] would have got[ten] her help." She insisted that the reason she did not immediately call the police the next day was because she was afraid of the Defendant. She claimed that "as much as [she did not] want it to be so, [she knew] there [was] nothing [she could] do for [the victim] or anybody else at that time[,]" and she had to protect herself and her other two children from the Defendant. She insisted that she "didn't feel like there was anything that [she could] do, that wasn't going to do anything but hurt [her], [M.T.] and [D.T.]."

Docket No. 23-14, pp. 2-11.

## II. PROCEDURAL HISTORY

The Petitioner was indicted with the victim's mother, Rawny J. Taylor, on August 6, 2013, and re-indicted on February 3, 2015. Docket No. 23-1, pp. 5-8, 10-15. The Grand Jury's indictment of Petitioner included four counts of aggravated child abuse, two counts of felony murder, and one count of false reporting. *Id.*

Following a jury trial in 2015, Petitioner was convicted of two counts of aggravated child abuse, two counts of felony murder, and one count of false reporting. *Id.* Petitioner was sentenced to twenty years on the two counts of aggravated child abuse and life on the two counts of felony murder. *Id.* Petitioner then timely filed an appeal as of right to the Tennessee Court of Criminal Appeals. Docket No. 23-11.

In his brief to the Tennessee Court of Criminal Appeals, Petitioner raised four issues for review. Docket No. 23-14, pp. 6, 11-18. First, Petitioner argued that the trial court erred in sustaining a verdict that was against the weight of the evidence. *Id.* at 11. Second, Petitioner

claimed the trial court improperly admitted overly graphic autopsy photographs of the victim. *Id.* at 14. Third, Petitioner argued the trial court erred by denying his motion for mistrial. *Id.* at 17. Lastly, Petitioner argued the trial court improperly admitted evidence of the victim's autopsy report which contained unredacted language regarding the previous physical abuse of the victim. *Id.* at 18. The Tennessee Court of Criminal Appeals issued a decision on February 28, 2017, affirming the trial court's judgments on all four claims. Docket No. 23-14. Petitioner filed an application for discretionary review by the Tennessee Supreme Court on April 14, 2017 (Docket No. 23-16), but his application was denied May 18, 2017. Docket No. 23-17.

Petitioner began seeking post-conviction relief in 2018. Docket No. 23-18, p. 4. On August 14, 2018, Petitioner filed a petition for post-conviction relief with the Montgomery County Circuit Court claiming denial of effective assistance of counsel during pretrial and at trial. *Id.* at 10. The Montgomery County Circuit Court granted Petitioner a hearing that was held on September 27, 2019. *Id.* at 1. On October 14, 2019, the Montgomery County Circuit Court denied Petitioner's petition for post-conviction relief. *Id.* Petitioner then filed an appeal to the Court of Criminal Appeals who affirmed the denial on July 28, 2020. *Id.*; Docket No. 23-26. The Tennessee Supreme Court denied Petitioner's application for permission to appeal on November 12, 2020. Docket No. 23-29.

Petitioner initially brought this habeas petition pro se on October 29, 2020. Docket No 1. The Federal Public Defender was subsequently appointed as counsel on January 13, 2021. Docket No. 5. On October 15, 2021, Petitioner, through counsel, filed an amended petition seeking habeas corpus relief. Docket No. 18.

Respondents filed an answer on February 11, 2021. Docket No. 28. Petitioner filed a Reply on September 12, 2022. Docket No. 35. Petitioner's issues raised will be reviewed below.

Petitioner's requests for relief are as follows: Petitioner asks the Court to declare his convictions and sentences unconstitutional, order a new trial, grant any requested discovery or process needed for the investigation and full presentation of his claims of constitutional error, and order an evidentiary hearing at which he can establish his entitlement to review of his claims or his entitlement to habeas relief. Docket No. 1, p. 10; Docket No. 18, p. 9; Docket No. 35, p. 14

## II. ISSUES PRESENTED FOR REVIEW

In the instant amended petition, Petitioner raises twenty claims for relief:

1. In violation of the Sixth and Fourteenth Amendments, Petitioner was indicted by a grand jury from which African-American and Hispanic persons and women were systematically underrepresented and/or excluded, including as foreperson. Under these circumstances, Petitioner was indicted in violation of the Sixth and Fourteenth Amendments, including the right to equal protection, due process, and to a grand jury and foreperson drawn from a fair cross-section of the community, and the indictment should have been quashed. Trial counsel was ineffective in failing to investigate and challenge the composition of the grand jury and the selection of grand jury foreperson.

2. In violation of the Fifth and Sixth Amendments and *Massiah v. United States*, 377 U.S. 201 (1964), the prosecution used Rawney Alvarez Taylor to secure statements from Petitioner after his right to counsel attached but without any knowing, intelligent, and voluntary waiver of the right to counsel, and then using those statements against Petitioner at trial. Trial counsel was ineffective in failing to investigate and challenge this constitutional violation.

3. In violation of the Fourteenth Amendment, Petitioner was denied a fair trial due to extensive pre-trial publicity in Montgomery County. Trial counsel was ineffective in failing to investigate, prepare, and present a motion for change of venue to show that Petitioner could not receive a fair trial in Montgomery County after the case received significant publicity.

4. Trial counsel was ineffective in failing to investigate, prepare, and present a motion to sever defendants to ensure a fair determination of Petitioner's guilt or innocence. Petitioner was denied a fair trial in violation of the Fourteenth Amendment.

15

5. In violation of due process of law under the Fourteenth Amendment, the prosecution knowingly presented false testimony, and/or withheld exculpatory evidence before trial and/or at trial. The prosecution did not disclose details of exculpatory impeachment evidence, such as cooperation with the government by witnesses or by co-defendant Rawney Taylor. Further examples of the withholding of exculpatory evidence will likely arise along with further investigation and discovery.

6. In violation of the Sixth and Fourteenth Amendments (including the violation of due process and equal protection), no transcript of jury selection/voir dire was ordered or prepared, thus precluding Petitioner from thoroughly presenting claims regarding jury selection on appeal. Petitioner was prejudiced by this failure. Trial counsel was ineffective in failing to request a transcript of jury selection to permit appellate and post-conviction review.

7. In violation of the Sixth and Fourteenth Amendments, the government struck prospective African American jurors in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). Trial counsel was ineffective in conducting voir dire, in failing to appropriately assess which jurors had been influenced by media coverage of the case, and failing to object to the government's unconstitutional strikes. Further investigation will likely reveal other failures.

8. Trial counsel was ineffective in failing to prepare and present objections to the introduction of inflammatory, prejudicial, and duplicative photographs. Witness testimony described hemorrhaging in the brain and eyes of the victim and it was inflammatory and prejudicial to also show the jury graphic photographs of this nature.

9. The autopsy report introduced by the government at trial contained un-redacted language regarding previous abuse of the victim, depriving Petitioner of his right to a fair trial.

10. The trial court violated Petitioner's constitutional rights of due process under the Fourteenth Amendment when it denied a mistrial after the counsel for co-defendant inappropriately asked witness Michael A. Mason a question regarding Petitioner's drug sales. This prejudiced the jury against Petitioner and the curative instruction given was not sufficient.

11. Trial counsel was ineffective in failing to request a mistrial after a government witness testified as to the presence of a shunt in the victim's head due to previous abuse. This prejudiced the jury against

Petitioner. Only counsel for the co-defendant objected, and the curative instruction given by the court was not sufficient.

12. Trial counsel was ineffective in failing to investigate, interview, and potentially call as defense witnesses various individuals who could have provided exculpatory evidence and testified on Petitioner's behalf.

13. Trial counsel was ineffective in failing to properly and fully investigate the physical evidence, including by not securing expert assistance.[2]

    i. Trial counsel did not enlist the help of an expert to rebut the medical testimony of Dr. Adele Lewis, who testified as to the cause of death being multiple blunt force trauma. Without an expert, trial counsel was unable to challenge the speculative opinions advanced by Dr. Lewis. Further, while trial counsel asked questions about "pseudo-bruising," counsel did not provide any expert testimony to support this theory.

    ii. Trial counsel did not enlist the help of an expert to explain how lighting could be/was used to make bruising appear more prominent in photographs, especially where witnesses testified that bruising was not apparent when they first entered the scene. Trial counsel did not enlist the help of an expert to determine how the adjustment of brightness and/or contrast made the photographs displayed to the jury appear inaccurate or exaggerated.

14. In violation of the Sixth Amendment and the Fourteenth Amendment's due process requirements, the trial court allowed the indictment to be amended for trial without presentation to the grand jury. These variances were material and prejudicial. Trial counsel was ineffective in failing to file a motion to dismiss the indictment. Additionally, no transcript was prepared of the reading of the charges to the jury, further prejudicing the Petitioner in the preparation of appellate and post-conviction motions. No transcript of the reading of the jury instructions was prepared.

---

[2] As is summarized below, Claim 13 of Petitioner's amended petition asserts trial counsel was ineffective in securing witnesses for the following reasons: (A) failing to secure an expert to rebut the testimony of Dr. Adele Lewis, who testified as to the cause of death being blunt force trauma, and support trial counsel's questions about "pseudo-bruising"; (B) failing to secure an expert to explain how lighting could be/was used to make bruising appear more prominent in photographs, especially when witnesses testified that bruising was not apparent when they first entered the scene. *See* Docket No. 18 at 6.

15. In violation of the Sixth and Fourteenth Amendments, the trial court provided jury instructions that denied Petitioner due process. The instructions relieved the prosecution of proving, and the jury from being required to find, Petitioner's guilt and all elements required for conviction beyond a reasonable doubt. The trial court instructed the jury that "Reasonable doubt is that doubt engendered by an investigation of all the evidence in the case and an inability, after such investigation, to let the mind rest easily as to the certainty of guilt. Absolute certainty of guilt is not demanded by the law to convict of any criminal charge, but moral certainty is required, and this certainty is required as every element of proof necessary to constitute the offense." These instructions were improper and violated Petitioner's constitutional rights. Trial counsel was ineffective in failing to object to these instructions.

16. In violation of the due process clause of the Fourteenth Amendment, there was insufficient evidence to support the essential elements of Petitioner's convictions of felony murder, aggravated child abuse, aggravated child neglect, and false report, especially where there was no direct evidence of Petitioner causing injuries that lead to death or inflicting abuse.

17. Trial counsel was ineffective in presenting absolutely no mitigation evidence at Petitioner's sentencing hearing. Trial counsel failed to fully and adequately investigate Petitioner's mental health and social history in order to develop and present mitigation evidence. Trial counsel failed to engage mental health professionals and expert witnesses to assist in preparing mitigation evidence.

18. In violation of the Sixth and Fourteenth Amendments, Petitioner was denied the effective assistance of trial counsel at trial and on the motion for new trial. Counsel performed deficiently, in violation of prevailing professional norms, *see, e.g.*, *Baxter v. Rose*, 523 S.W.2d 930 (Tenn. 1975); American Bar Association Standards for Criminal Justice; The Defense Function, and Petitioner was prejudiced thereby. Counsel's performance was deficient, and there is a reasonable probability that, had counsel performed effectively, Petitioner would not have been convicted of felony murder and aggravated child abuse and neglect, and/or would have received a new trial. This petition presents a non-exhaustive list of trial counsel's failures.

19. In violation of the Sixth and Fourteenth Amendments, Petitioner was denied the effective assistance of appellate counsel. Counsel's performance was deficient, and there is a reasonable probability that, had counsel performed effectively, Petitioner would have

secured relief on direct appeal and received a new trial on the charges of felony murder and/or aggravated child abuse and neglect. Appellate counsel was ineffective in failing to raise in the appeal briefing, or to thoroughly present, the issues raised in this petition.

20. In violation of due process under the Fourteenth Amendment, the cumulative effect of all errors at trial and/or on appeal deprived Petitioner of a fair trial and/or fair direct appeal whose result was fair and reliable.

Docket No. 18, pp. 3-9. In his twenty-first and final claim, Petitioner incorporates all claims raised in Petitioner's initial pro se habeas petition (Docket No. 1). *Id.* at 9.

Respondent answers that, as a preliminary matter, all claims in the amended petition are untimely and barred from review. Docket No. 28, 17-20. Respondent notes the amended petition was filed after the statute of limitations expired in November 2020 and the original petition was timely filed. *Id.* While the claims in an amended petition can relate back to the date of the original petition, Respondent argues that the new claims in the amended petition do not relate back to the date of the original petition because the new claims do not share a "common core of operative facts" with the original petition. *Id.* at 17-19. As a result, Respondent argues these claims are time barred. *Id.* at 20.

Respondent also alleges that the decision of the Tennessee Court of Appeals was reasonable when it concluded that the evidence against Petitioner was sufficient to support Petitioner's convictions of aggravated child abuse, felony murder, and false reporting. *Id.* at 20. Furthermore, Respondent argues that Petitioner's claim relating to the denial of his motion for mistrial is not cognizable on federal habeas corpus review. *Id.* at 24. Even if the claim were reviewable, Respondent argues that it was procedurally defaulted because Petitioner raised the issue as entirely a matter of state law. *Id.* at 24-25.

Lastly, Respondent alleges that all claims contained in Petitioner's pro se habeas petition

are procedurally defaulted and barred from review. *Id.* at 25. Respondent also argues that claims 1-3, 5, 6, 9, 10, 12-15, 18-20 of Petitioner's amended petition are procedurally defaulted due to the untimely filing of Petitioner's state-court petition for post-conviction relief. *Id.*

In his reply, Petitioner maintains that he is entitled to relief on each of his claims. Docket No. 35. Petitioner asserts that his claims relate back to his pro se petition and are timely because the Court should consider a state court petition attached to the pro se petition that Petitioner frequently cited, and Respondent does not cite any support prohibiting the Court from considering it. *Id.* at 1-3. Petitioner contends that the trial court's decision was unreasonable, given that there was no direct evidence that Petitioner did abuse the victim nor was there evidence of intent. *Id.* at 3. Furthermore, Petitioner maintains that after a *Martinez* hearing and further briefing, he will demonstrate that the circumstantial evidence was insufficient to establish the intent necessary for his convictions. *Id.* at 4. Petitioner asserts he "was under no obligation to anticipatorily rebut the affirmative defense of default which Respondent has now raised in his answer." *Id.* Petitioner argues that "*Martinez* applies to excuse all of the procedurally defaulted ineffective assistance of counsel claims (claims 1-15, 18, 17, and 20 in the Amended Petition)."[3] *Id.* at 4-5.

### III.   STANDARD OF REVIEW

#### A.   AEDPA Standard

Because Petitioner filed his application for habeas relief after April 24, 1996, his amended petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104-132, 110 Stat. 214 (1996). The AEDPA amended the standard for granting habeas relief as follows:

> (d) An application for a writ of habeas corpus on behalf of a person
> in custody pursuant to the judgment of a State court shall not be

---

[3] Throughout this Report and Recommendation, the Court may refer to ineffective assistance of counsel by the acronym, "IAC."

granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The "contrary to" and "unreasonable application" clauses have independent meaning. *Williams v. Taylor*, 529 U.S. 362, 404 (2000). With regard to the former, a state court's decision is "contrary to" clearly established law if it "'applies a rule that contradicts the governing law set forth in our cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (quoting *Williams*, 529 U.S. at 405-06). As to the latter, "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams*, 529 U.S. at 410 (emphasis added). A federal habeas court making an "'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409. The phrase "clearly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta" of Supreme Court decisions at the time of the relevant state court decision. *Id.* at 412.

To obtain habeas relief from a federal court, a habeas petitioner must show that "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-

minded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). Where state courts have made factual determinations regarding issues presented for federal habeas corpus review, such determinations are presumed to be correct, and the petitioner has the burden of rebutting that presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Under the AEDPA, the purpose of habeas review is to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

### B.    Exhaustion Requirement and Procedural Default

Before a federal court may review a claim raised in a habeas petition, it must be determined whether the petitioner has exhausted the remedies available in state court. 28 U.S.C. § 2254(b)(1). A federal court shall not grant an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court unless the applicant has exhausted the remedies available in courts of the state, the applicant has no state corrective process, or the process is ineffective to protect the rights of the applicant. 28 U.S.C. § 2254(b)(1)(A)-(B).

To properly exhaust available state remedies, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

In Tennessee, a petitioner need not file an application for permission to appeal to the Tennessee Supreme Court to exhaust all state remedies; an appeal to the Tennessee Court of Criminal Appeals is sufficient. Tenn. Sup. Ct. R. 39; *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (holding that Rule 39 removes Tennessee Supreme Court review as an antecedent for federal habeas review). Further, in order to properly exhaust a habeas claim in state court, "a petitioner must assert both the legal and factual basis for his or her claim." *Williams*, 460 F.3d at

806. To satisfy this requirement and avoid a procedural default, a petitioner's federal habeas claim must be based on the same theory presented in state court and cannot be based on a wholly separate or distinct theory. *Carter v. Mitchell*, 829 F.3d 455, 461 (6th Cir. 2016); *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998).

The procedural default doctrine provides that if a petitioner fails to satisfy adequate and independent state procedural requirements, he forfeits his right to present his claims on federal habeas review. *Coleman v. Thompson*, 501 U.S. 722, 732 (1991). A procedural default can occur in one of two ways. First, a procedural default may occur if the state court actually "relied on the procedural bar as an independent basis for its disposition of the case." *Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985). Second, if a petitioner fails to properly exhaust a claim in state court, and the claim can no longer be raised in state proceedings because of a failure to follow state procedure for presenting such a claim, the claim is technically exhausted, but a petitioner is not automatically entitled to present his claim on federal habeas review, as his claim is procedurally defaulted. *Woodford v. Ngo*, 548 U.S. 81, 126 (2006).

In those cases in which a state prisoner has defaulted his federal claims in state court pursuant to an adequate and independent state procedural rule, federal habeas review of any such claim is barred "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. at 750. Whether a petitioner has established cause "must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). To establish actual prejudice, a petitioner must show "not merely that the errors at his trial created a *possibility* of

prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis original). With regard to a fundamental miscarriage of justice, a petitioner must show "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *McQuiggin v. Perkins*, 569 U.S. 383, 399 (2013) (internal quotation marks omitted) (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). For a petitioner to "pass through the gateway" and be permitted to argue the merits of his defaulted claims, he must show "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *Id.* at 401 (internal quotation marks omitted) (quoting *Schlup*, 513 U.S. at 316).

### C.  Consideration of Attachments to Habeas Petitions and Relation Back of Claims

Rule 2 of the Rules Governing § 2254 Cases outlines the requirements of a § 2254 habeas corpus petition. Rules Governing § 2254 Cases. Rule 2 states that the petition must: (1) specify all grounds for relief available to the petitioner; (2) state the facts supporting each ground; (3) state the relief requested; (4) be legible; and (5) be signed under penalty of perjury. *Id.* Additionally, Rule 2 states that the petition must "substantially follow" the habeas petition form. *Id.* Furthermore, pleadings and documents filed by pro se litigants are to be "liberally construed," and a "pro se complaint, however inartfully pleaded, must be held to a less stringent standard than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). The Sixth Circuit Court of Appeals has applied a lenient interpretation of pro se habeas petitions in the past. For example, in *Franklin v. Rose*, a Sixth Circuit panel reversed a district court that did not afford a pro se petition this liberal construction when the petitioner's habeas petition referenced an attached brief from his appeal to the Tennessee

24

Criminal Court of Appeals.  765 F.2d 82, 83-84 (6th Cir. 1985).

AEDPA provides a one-year statute of limitations for § 2254 habeas corpus petitions.  28 U.S.C. § 2244(d)(1).  Relevant to the case at bar, the statute of limitations begins running on the date following the conclusion of direct review or the expiration of the time seeking direct review. § 2244(d)(1)(A).  Additionally, the statute of limitations is tolled while "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending."  28 U.S.C. § 2244(d)(2).  However, under Fed. R. Civ. P. 15(c)(1), a court can consider new claims raised in an amended petition filed after the one-year statute of limitations if the claims relate back to the original petition by arising "out of the conduct, transaction, or occurrence set out–or attempted to be set out–in the original pleading."  In short, newly amended habeas claims do not relate back, and thereby avoid the limitations period, when they assert new grounds for relief supported by facts that differ from the "common core of operative facts" contained in the original petition.  *Mayle v. Felix*, 545 U.S. 640, 664 (2005).

### D.  Standard for Granting Evidentiary Hearings

Since the time that Petitioner filed his petition for habeas corpus in this Court, the law on the availability of evidentiary hearings in federal court for state habeas petitioners has changed. As the Supreme Court recently recognized, AEDPA "restricts the ability of a federal habeas court to develop and consider new evidence."  *Shoop v. Twyford*, 142 S. Ct. 2037, 2043 (2022). Specifically, the statute allows the development of new evidence in "two quite limited situations:" (1) when the claim relies on a "new" and "previously unavailable" "rule of constitutional law" made retroactive by the Supreme Court, or (2) when the claim relies on a "factual predicate that could not have been previously discovered through the exercise of due diligence."  *Id.* at 2044 (quoting 28 U.S.C. § 2254(e)(2)).

Even if a prisoner can satisfy either of those exceptions, to obtain an evidentiary hearing, the prisoner still must show by "clear and convincing evidence" that "no reasonable factfinder" would have convicted him of the crime charged. *Shinn v. Ramirez*, 142 S. Ct. 1718, 1734 (2022) (quoting 28 U.S.C. § 2254(e)(2)(A)(i), (ii)).

Where a petitioner relies on *Martinez v. Ryan* to excuse a procedural default, a federal court may not hold an evidentiary hearing if the petitioner "failed to develop the factual basis of [his] claim in State court proceedings." 132 S. Ct. 1309 (2012); 28 U.S.C. § 2254(e)(2).

## IV.     ANALYSIS

### E.     Whether Petitioner's Claims in the Amended Petition "Relate Back" to the Pro Se Petition

As discussed above, Petitioner filed a pro se petition on August 14, 2018. Docket No. 1. In his pro se petition, Petitioner attached and referenced his state post-conviction review ("PCR") petition. *Id.* As previously mentioned, Petitioner later filed an amended petition on October 15, 2021. Docket No. 18.

Respondent maintains that the Court should not consider Petitioner's attached PCR petition. Docket No. 28, pp. 18-19. Respondent argues that doing so would undermine the purpose of Rule 2 of the Rules Governing § 2254 Cases. *Id.* Respondent continues that, as a result, Petitioner's claims in his pro se petition should not be considered because they are conclusory due to only referencing Petitioner's attached PCR petition. *Id.* Additionally, Respondent argues that Petitioner's pro se petition does not provide any facts for the amended petition claims to "relate back" to, and, as such, all claims in the amended petition are time barred. *Id.* at 19-20.

In his Reply, Petitioner requests that the Court consider the attached PCR petition and asserts that all claims in the amended petition relate back to the pro se petition. Docket No. 35, p. 1. Petitioner argues that there is no language in Rule 2 of the Rules Governing § 2254 Cases that

precludes a habeas petitioner from attaching a state court filing and citing to it. *Id.* at 2. Additionally, Petitioner notes that Respondent cites no case law in support of its assertion that the Court should not consider the attached PCR petition. *Id.* Lastly, Petitioner argues that the Sixth Circuit has consistently granted leniency in interpreting pro se petitions, and Petitioner cites several cases that Petitioner believes illustrate a rule of leniency for interpreting pro se petitions. *Id.*

### 1. Whether the Court Will Consider the Attached PCR Petition in Determining Relation Back

Put simply, nothing in Rule 2 of the Rules Governing § 2254 Cases prohibits Petitioner from attaching a PCR petition to his petition for habeas relief. Additionally, and in compliance with Rule 2, Petitioner follows the directions on the printed form petition provided by the District Court for persons in state custody. *See* Rules Governing § 2254 Cases; Docket No. 1, pp. 1-22. Specifically, the form requests that Petitioner attach "additional pages" if he has more than four grounds, which Petitioner follows.[4] Docket No. 1, p. 4. Furthermore, this Court finds that Petitioner's attachment of his PCR petition is sufficiently analogous to the petition in *Franklin*, in which the Sixth Circuit provided "liberal treatment" to a pro se petition. *See Franklin*, 765 F.2d at 84-85. Lastly, the District Court has already previously considered the attached PCR petition in determining Petitioner's claims. In a prior order, this Court noted the difficulty of interpreting from the pro se petition which claims Petitioner intended to raise, and therefore ordered the appointment of the Federal Public Defender to file an amended petition on behalf of Petitioner. Docket No. 5. It follows that this Court will now consider the attached PCR petition when determining whether the claims in the amended petition relate back to the pro se petition.

---

[4] The form requests attaching additional grounds on which Petitioner is held in violation of the law; however, the Court notes that the form only provides space for three grounds. Docket No. 1, pp. 1-10.

## 2.    Whether Claims in the Amended Complaint Relate Back

The parties seem to agree that the original pro se petition (Docket No. 1) was timely filed and the amended petition (Docket No. 18) was filed after the expiration of the one-year limitation period. As discussed above, in order to consider those claims raised for the first time in the amended petition as timely filed, they must "relate back" to the "common core of operative facts" alleged in the original pro se petition. Fed. R. Civ. P. 15(c)(1); *see Mayle*, 545 U.S. at 664.

The Court finds that all claims "relate back" to the "common core of operative facts" alleged in the original pro se petition. Fed. R. Civ. P. 15(c)(1); *see Mayle*, 545 U.S. at 664. When considering the pro se petition and the attached PCR petition, the majority of claims raised in the amended petition are not new. These claims derive from facts and claims in the pro se petition and the attached PCR petition. *See, e.g.*, Docket No. 18, pp. 3-10 (alleging underrepresentation in grand jury, ineffective assistance with pre-trial publicity claim, failure to present a motion to sever, and failure to disclose exculpatory evidence); Docket No. 1, pp. 23-32 (discussing or alleging underrepresentation in grand jury, ineffective assistance with pre-trial publicity claim, severing of trials, and a failure to disclose exculpatory evidence).

### F.    Petitioner's Request for an Evidentiary Hearing

In his amended petition and reply, Petitioner requests a *Martinez* hearing and argues that *Martinez* applies to excuse "his various defaulted ineffectiveness claims." Docket No. 18, p. 9; Docket No. 35, p. 1. In its response to Petitioner's amended petition, Respondent argues that Petitioner should not be granted an evidentiary hearing and that Petitioner has not complied with the requirements for an evidentiary hearing listed under 28 U.S.C. § 2254(e)(2). Docket No. 28, pp. 27-28.

As discussed above, the law has changed since Petitioner and Respondent filed these initial

documents. *Shinn* now makes it clear that *Martinez* cannot be the basis for an evidentiary hearing if § 2254(e)(2) precludes the Court's consideration of that evidence on the underlying claim. 142 S. Ct. at 1736-39 (2022). This is the case for Petitioner. Based on *Martinez*, he asserts that post-conviction counsel's ineffective assistance is cause "to excuse all of the procedurally defaulted ineffective assistance of counsel claims (claims 1-15, 18, 17, and 20 in the Amended Petition)." Docket No. 35, pp. 4-5. However, post-conviction counsel's failure to develop the record to support those underlying claims in state court is attributed to Petitioner such that he is "at fault" for the underdeveloped record and, therefore, must satisfy § 2254(e)(2) in order for this Court to consider any evidence beyond the state-court record. *See Shinn*, 142 S. Ct. at 1735. Petitioner cannot do so because none of his ineffective-assistance claims rely on a retroactively applicable new rule of constitutional law or are based on a factual predicate that he could not have previously discovered through the exercise of due diligence during his trial or post-conviction proceedings in state court. *See* 28 U.S.C. § 2254(e)(2)(A). Therefore, further discovery on those claims is now foreclosed by *Shinn*, and this Court must decide those claims based solely on the state-court record.

### G. Petitioner's Exhausted Claim

Petitioner properly exhausted Claim 16, that Petitioner's state court conviction was based on insufficient evidence, on direct appeal in the Tennessee Court of Criminal Appeals. *See* Docket No. 23-14. However, even when a claim has been properly exhausted, a court may "entertain an application for a writ of habeas corpus in [sic] behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A claim asserting only a violation of state law, even if properly exhausted, is not cognizable on federal habeas review. *Pulley v. Harris*, 465 U.S. 37, 41 (1984).

For the reasons stated below, the Undersigned finds that Petitioner's properly exhausted claim does not support granting a writ of habeas corpus.

### 1. Claim 16 - Insufficiency of the Evidence

Petitioner submits that there is insufficient evidence to support his convictions because the State presented no direct evidence "that Petitioner caused the injuries that lead to the victim's death nor that he intended to abuse the victim, as required at the time pursuant to Tenn. Code Ann. § 39–13–202(a)(2)." Docket No. 35, p. 3. Petitioner does admit that, in Tennessee, guilt can be established solely on circumstantial evidence, but he argues that the lack of evidence that he had the necessary intent and lack of showing that he abused the victim demonstrate that no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*; *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Petitioner also argues for a *Martinez* hearing for the purpose of further demonstrating that the evidence was insufficient to establish his intent. Docket No. 35, p. 4.

In its Answer to the Petition, Respondent argues that, given the evidence presented, a rational juror could find that the Petitioner committed child abuse, aggravated child abuse, felony murder, and false reporting. Docket No. 28, p. 24. Additionally, Respondent maintains that the Tennessee Court of Criminal Appeals "made a reasonable decision when it held the evidence was sufficient to support Petitioner's criminal convictions." *Id.*

The Court of Criminal Appeals addressed this argument on direct appeal as follows:

> As relevant here, first degree felony murder is defined as, "[a] killing of another committed in the perpetration of or attempt to perpetrate…aggravated child abuse…" See Tenn. Code Ann. § 39–13–202(a)(2). Additionally, "[n]o culpable mental state is required for conviction under subdivision (a)(2) or (a)(3), except the intent to commit the enumerated offenses or acts in those subdivisions." Id. A person commits the offense of aggravated child abuse, who commits child abuse, and the act of abuse results in serious bodily

injury. See Tenn. Code Ann. § 39–15–402. Child abuse is defined as "knowingly, other than by accidental means, treat[ing] a child under eighteen (18) years of age in such a manner as to inflict injury[.]" Tenn. Code Ann. § 39–15–401(a).

An individual makes a false report when they "[i]nitiate a report or statement to a law enforcement officer concerning an offense or incident within the officer's concern knowing that…[t]he information relating to the offense reported is false." See Tenn. Code Ann. § 39–16–502.

Here, there is sufficient proof to support the Defendant's convictions. Multiple emergency responders testified regarding the state in which the victim was found. She had blood on her nose and lip, and there were bruises on her body. The medical examiner testified about the extensive injuries that led to the victim's death, and her expert opinion was that the victim suffered from battered child syndrome and her death was a homicide. The Defendant was alone with the victim on the day of her death. Further, his daughter M.T. testified that she saw the Defendant "beat" the victim. The Defendant waited five hours after finding the victim before calling the police and then lied about when he found her. Ms. Taylor testified that the Defendant commented that he hoped "this didn't happen when [he] threw her on the bed and she hit her head[.]" Accordingly, we conclude that the evidence was sufficient to sustain the Defendant's conviction for murder in the first degree in the perpetration of or attempt to perpetrate aggravated child abuse, aggravated child abuse, and false reporting.

Docket No. 23-14, p. 12.

In *Jackson v. Virginia*, the Supreme Court set forth the standard for reviewing the legal

sufficiency of the evidence in support of a conviction:

> …[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilty beyond a reasonable doubt. But this inquiry does not require a court to "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

443 U.S. 307, 318-19 (1979) (internal citations omitted).

Upon review, "all of the evidence is to be considered in the light most favorable to the

prosecution." *Id.* at 319. If any rational trier of fact would accept the evidence as establishing each essential element of the crime beyond a reasonable doubt, the *Jackson* standard of review is satisfied. *Coleman v. Johnson*, 566 U.S. 650, 654 (2012).

*Jackson* claims face a higher bar on habeas review in federal court because they are subject to two layers of judicial deference. *Id.* at 651. First, on direct appeal, "it is the responsibility of the jury–not the court–to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Id.* (internal quotation marks omitted) (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (*per curiam*)). Second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Id.* (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)).

As a preliminary matter, Petitioner properly exhausted his insufficient evidence claim by giving the state courts "one full opportunity to resolve any constitutional issues" and appealing to the Court of Criminal Appeals. *See O'Sullivan*, 526 U.S. at 845. Additionally, Petitioner's insufficient evidence claim is not procedurally defaulted because the Court of Criminal Appeals addressed his claim on its merits. Docket No. 23-14, p. 12.

Even so, in viewing the evidence in the light most favorable to the State, the Undersigned finds that the Tennessee state courts could conclude that the evidence was sufficient to support Petitioner's conviction. Based on the proof offered at trial, specifically the testimony of multiple emergency responders, the statements made by M.T., the fact that Petitioner was solely parenting the victim the day she died, Petitioner's delay in calling emergency services upon discovering the

victim dead, and Petitioner's lying to the police regarding his discovery of the victim, the Tennessee Court of Criminal Appeals appropriately "conclude[d] that the evidence was sufficient to sustain the Defendant's conviction for murder in the first degree in the perpetration of or attempt to perpetrate aggravated child abuse, aggravated child abuse, and false reporting." Docket No. 23-14, p. 12. For these reasons, the Undersigned finds that the state court's decision was not objectively unreasonable. Petitioner is therefore not entitled to relief on this claim, and, as discussed above, the Court is not granting an evidentiary hearing to further establish evidence of insufficiency.

### H.  Procedurally Defaulted Non-IAC Claims

#### 1.  Claim 5 - Knowingly Presenting False Testimony and/or Withholding of Exculpatory Evidence

Petitioner contends that "the prosecution knowingly presented false testimony, and/or withheld exculpatory evidence before trial and/or at trial" in violation of his due process rights under the Fourteenth Amendment. Docket No. 18, p. 4. Respondent argues that this claim is procedurally defaulted and barred from evidence. Docket No. 28, p. 26.

Petitioner exhausted this claim by raising it in state post-conviction review; however, this claim was procedurally defaulted when Petitioner's PCR petition was dismissed for failing to comply with the applicable statute of limitations. Docket No. 23-18, p. 96. Petitioner does not frame this in any way as a procedurally defaulted ineffective assistance of counsel claim in his amended petition. Petitioner only makes a one-off reference to this being an ineffective assistance of counsel claim in his Reply, where he "maintains that *Martinez* applies to excuse all of the procedurally defaulted ineffective assistance of counsel claims (claims 1-15, 18, 17, and 20 in the Amended Petition)." Docket No. 35, pp. 4-5.

In the Court's view, Petitioner did not seek to raise this claim as an ineffective assistance

of counsel claim. As a result, Petitioner provides no argument to excuse this default for cause and has accordingly failed to satisfy this requirement. In his pro se petition, Petitioner references in several paragraphs the State's withholding of impeachment evidence; however, for the most part these claims are conclusory. Docket No. 1, pp. 35-37. Petitioner's one reference to a specific instance of withholding of exculpatory evidence, that a prosecution witness Michael Mason had reason to testify against Petitioner, does not exclude the prosecution's other evidence that this Court addressed above. *Id.* at p. 37. Therefore, Petitioner has not established actual prejudice given the knowledge of such impeachment evidence would not have impacted the outcome of Petitioner's trial. *See Frady*, 456 U.S. at 170. Petitioner has also not established a fundamental miscarriage of justice. *See McQuiggin*, 569 U.S. at 399. Even if the Court were to consider this an ineffective assistance of counsel claim and excuse default for cause, Petitioner has not established actual prejudice, and the Court is not holding an evidentiary hearing under *Martinez*. Docket No. 1, p. 28. Consequently, Petitioner is not entitled to relief on this claim.

### 2. Claim 9 - Unredacted Autopsy Report

Petitioner also argues that the "autopsy report introduced by the government at trial contained un-redacted language regarding previous abuse of the victim, depriving Petitioner of his right to a fair trial." Docket No. 18, p. 5. Respondent argues that this claim is procedurally defaulted and barred from review. Docket No. 28, p. 25.

Petitioner exhausted this claim by raising it in the Tennessee Court of Criminal Appeals; however, this claim was procedurally defaulted because it was waived on appeal. Specifically, the Court of Criminal Appeals stated that Petitioner "failed to object to the introduction of the report at trial and…made no request that the 'allegedly offensive portion be redacted.'" Docket No. 23-14, p. 16. Like the previous claim, Petitioner does not frame this as an ineffective assistance of

counsel claim, and he only appears to reference it as one when he groups nearly all his claims as ineffective assistance claims in a brief parenthetical in his Reply. Docket No. 35, pp. 4-5.

As a result, Petitioner provides no argument to excuse this default for cause and has accordingly failed to satisfy this requirement. Furthermore, Petitioner provides no facts supporting this claim. Petitioner has not established prejudice or a fundamental miscarriage of justice either. Accordingly, Petitioner is not entitled to relief on this claim.

### 3. Claim 10 - Denial of Motion for Mistrial

In his Amended Petition, Petitioner argues that "the trial court violated [his] constitutional rights of due process under the Fourteenth Amendment when it denied a mistrial after the counsel for co-defendant inappropriately asked [a witness] a question referencing Petitioner's drug sales." Docket No. 18, p. 5. Petitioner also states that the "curative instruction given was not sufficient." *Id.* Respondent argues that this claim is not cognizable on federal habeas review because a decision to grant a mistrial is purely a matter of state law and, even if cognizable, it is procedurally defaulted because Petitioner raised this claim as purely a matter of state law on direct appeal. Docket No. 28, 24-25. In his Reply, Petitioner does not address Respondent's argument that he raised this claim only under state law. *See* Docket No. 35.

The Court of Criminal Appeals addressed this argument on direct appeal as follows:

> In his brief, the Defendant mentions Tennessee Rule of Evidence 609, which addresses witness impeachment by evidence of a conviction of a crime. However, this rule of evidence is not relevant here. At trial, counsel for the co-defendant asked a witness if he "had any personal knowledge that [the Defendant] ha[d] sold marijuana in the past." Before the witness could respond, both counsel for the Defendant and the State objected to this question. The court did not allow the witness to answer and instructed the jury to disregard the question. There was no mention of a prior conviction; rather, such a question raises the issue of a prior bad act. Tennessee Rule of Evidence 404(b) is the appropriate rule to apply to this issue. The rule states, "Evidence of other crimes, wrongs, or acts is not

35

admissible to prove the character of a person in order to show action in conformity with the character trait." Thus, the Defendant waives the issue for inadequately raising a relevant argument in his brief. Once again, plain error analysis is not necessary. The witness never responded to the question, and the trial court adequately addressed the improper question by issuing a curative instruction. Thus, the Defendant is not entitled to plain error relief because review of this issue is not necessary to do substantial justice.

Docket No. 23-14, p. 16.

The Court, upon review of the record, agrees with the Respondent that this claim was only raised under state law on direct appeal to the Tennessee Court of Criminal Appeals. Docket No. 28, pp. 24-25. Petitioner makes no reference to federal law or the United States Constitution in his brief on direct appeal. Docket No. 23-12, p. 16. Instead, Petitioner cites the Tennessee Rules of Evidence. *Id.* Furthermore, in ruling on the issue, the Tennessee Court of Criminal Appeals framed the issue in terms of state law, and cited only to state law, before ultimately refusing to provide the Petitioner with relief. Docket No. 23-14, p. 16. Petitioner only raised his claim as a matter of state law on appeal, and Petitioner has no further opportunity to raise this claim in state court. *See Woodford*, 548 U.S. at 126 (discussing procedural default occurring when claim is not properly exhausted); Tenn. Code Ann. 40-30-102(c) (limiting filing to only one petition for post-conviction relief). As a result, Petitioner procedurally defaulted this claim.

Like the previous two claims, Petitioner does not frame this as an ineffective assistance of counsel claim, and he only appears to reference it as one when he groups nearly all his claims as ineffective assistance claims in a brief parenthetical in his Reply. Docket No. 35, pp. 4-5. As a result, Petitioner provides no argument to excuse this default for cause and has accordingly failed to satisfy this requirement. Petitioner has also not proven prejudice nor established that non consideration would result in a fundamental miscarriage of justice. Beyond the two sentences outlining the claim in the amended petition, Petitioner provides no facts supporting any

constitutional violation occurring from the denial of the motion for mistrial.  Even assuming that this claim is cognizable on federal habeas review, it is procedurally defaulted.  As a result, Petitioner is not entitled to relief on this claim.

## I.       IAC Claims

Petitioner asserts that he was denied the effective assistance of trial counsel.  Docket No. 18.  Petitioner argues that *Martinez v. Ryan* applies to excuse the procedural default of his ineffectiveness claims.  Docket No. 35, p. 4.

In *Martinez v. Ryan*, the Supreme Court held that "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." 566 U.S. 1, 17 (2012).  An ineffectiveness claim is insubstantial, and thus insufficient to invoke *Martinez*, if "it does not have any merit or…it is wholly without factual support, or…the attorney in the initial-review collateral proceeding did not perform below constitutional standards." *Id.* at 15-16.  In *Trevino v. Thaler*, the Supreme Court expanded the *Martinez* exception to situations where a "state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal." 569 U.S. 413, 429 (2013).  The Sixth Circuit has held that the *Martinez-Trevino* exception applies in Tennessee cases.  *Sutton v. Carpenter*, 745 F.3d 787, 795 (6th Cir. 2014).

The Sixth Circuit has provided the following framework to evaluate claims under *Martinez*:

> As to these claims, the district court should determine…: (1) whether state post-conviction counsel was ineffective; and (2) whether [Petitioner's] claims of ineffective assistance of counsel were "substantial" within the meaning of *Martinez*, *Sutton*, and *Trevino*. Questions (1) and (2) determine whether there is cause. The next question is (3) whether [Petitioner] can demonstrate prejudice.

> Finally, the last step is: (4) if the district court concludes that
> [Petitioner] establishes cause and prejudice as to any of his claims,
> the district court should evaluate such claims on the merits.

*Atkins v. Holloway*, 792 F.3d 654, 660 (6th Cir. 2015) (internal citations omitted).

Whether post-conviction counsel was ineffective is necessarily connected to the strength of the underlying claim he failed to raise, so "in many habeas cases seeking to overcome procedural default under *Martinez*, it will be more efficient for the reviewing court to consider in the first instance whether the alleged underlying ineffective assistance of counsel was 'substantial' enough to satisfy the 'actual prejudice' prong of *Coleman*." *Smith v. Carpenter*, No. 3:99-cv-0731, 2018 WL 317429, at *2 (M.D. Tenn. Jan. 8, 2018) (quoting *Thorne v. Holloway*, No. 3:14-cv-0695, 2014 WL 4411680, at *23 (M.D. Tenn. Sept. 8, 2014)), *aff'd sub nom. Thorne v. Lester*, 641 Fed. Appx. 541 (6th Cir. 2016).

If the underlying claim is not sufficiently substantial, "because the 'cause and prejudice' standard is conjunctive rather than disjunctive, the reviewing court would have no need to consider whether the petitioner has established cause to overcome the procedural default, in the form of ineffective assistance of post-conviction counsel." *Thorne v. Holloway*, 2014 WL 4411680, at *23. And if the ineffective assistance of trial counsel claim cannot satisfy actual prejudice, there "could not be a reasonable probability that the result of post-conviction proceedings would have been different." *Id.* (quoting *Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014)) (overruled on other grounds by *McKinney v. Ryan*, 813 F.3d 798, 818 (9th Cir. 2015) (*en banc*)).

To establish ineffective assistance of counsel, a petitioner must demonstrate that, under the totality of the circumstances, his or her trial counsel performed deficiently and counsel's performance resulted in prejudice. *Strickland v. Washington*, 466 U.S. 668, 687, 695 (1984). As the Supreme Court explained:

> A convicted defendant's claim that counsel's assistance was so

38

defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687.

As to the "performance" inquiry, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 688. To satisfy this prong, counsel must fulfill his or her duty to investigate—"to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. *Strickland* directs that "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* As the Supreme Court noted:

> …[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.
>
> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain

39

investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

*Id.* at 690-91.

As to the "prejudice" inquiry, a petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Williams*, 529 U.S. at 391. In essence, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Strickland*, 466 U.S. at 694.

The benchmark for judging any ineffectiveness claim is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686. The court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689; *see also West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) ("[T]he determinative issue is not whether petitioner's counsel was ineffective but whether he was so thoroughly ineffective that defeat was 'snatched from the jaws of victory.'") (citing *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992)).

In its response to Petitioner's amended petition, Respondent answers that every claim in Petitioner's pro se petition is procedurally defaulted due to the untimely filing of Petitioner's PCR petition. Docket No. 28, p. 26. Furthermore, Respondent maintains that *Martinez* does not apply to excuse cause to procedural default of Petitioner's PCR claims because the default occurred while petitioner "was acting pro se and before the appointment of post-conviction counsel." *Id.* at

27.

Petitioner does not deny that his claims were procedurally defaulted; instead, he argues that *Martinez* applies to excuse default of all of his ineffective assistance claims. Docket No. 35, p. 4. Petitioner also contends in his reply that he was under no obligation to anticipatorily rebut the affirmative defense of procedural default, and that he can overcome the default of these claims based on several different theories. *Id.* For the reasons discussed below, Petitioner has failed to demonstrate the cause and actual prejudice or fundamental miscarriage of justice necessary to overcome the procedural default of these claims.

### 1. Anticipatory Pleading to Overcome Procedural Default Affirmative Defense

As a preliminary matter, Petitioner argues that he was under no obligation to anticipatorily rebut the affirmative defense of procedural default. *Id.* Petitioner is correct that procedural default is an affirmative defense, and that the burden is on the government to raise a procedural default issue. *Flood v. Phillips*, 90 Fed. Appx. 108, 114 (6th Cir. 2004) (holding that the government, in order not to waive the defense, "was required to assert procedural default as an affirmative defense in its responsive pleading"). A petitioner is not required to answer the defense until after the government asserts it. *Vanwinkle v. United States*, 645 F.3d 365, 370 (6th Cir. 2011). Petitioner therefore appropriately first addressed Respondent's assertion of procedural default in his reply.

### 2. Claim 1 - Exclusion and Underrepresentation of Jurors

Petitioner argues that:

> In violation of the Sixth and Fourteenth Amendments, [he] was indicted by a grand jury from which African-American and Hispanic persons and women were systematically underrepresented and/or excluded, including as foreperson. Under these circumstances, Petitioner was indicted in violation of the Sixth and Fourteenth Amendments, including the right to equal protection, due process, and to a grand jury and foreperson drawn from a fair cross-section of the community."

41

Docket No. 18, p. 3.

Petitioner also argues that "[t]rial counsel was ineffective in failing to investigate and challenge the composition of the grand jury and the selection of grand jury foreperson." *Id.*

Petitioner's due process challenge is without merit. In *Hobby v. United States*, the Supreme Court held that "[d]iscrimination in the selection of grand jury foremen—as distinguished from discrimination in the selection of the grand jury itself—does not in any sense threaten the interests of the defendant protected by the Due Process Clause." 468 U.S. 339, 344 (1984). Where the role of the grand jury foreman is "essentially clerical in nature," discrimination in the appointment of the grand jury foreman is not so significant to the administration of justice as to impugn the fundamental fairness of the process itself and undermine the integrity of the indictment. *Id.* at 344, 345. The Tennessee Supreme Court has recognized that "the role of the grand jury foreperson in Tennessee is ministerial and administrative," and thus does not threaten due process. *State v. Bondurant*, 4 S.W.3d 662, 675 (Tenn. 1999). Petitioner has provided no argument for why this Court should question that determination. Petitioner therefore cannot establish actual prejudice to excuse the default of this claim on due process grounds.

Regarding Petitioner's Sixth Amendment challenge, the Sixth Circuit in *Henley v. Bell* explicitly stated that "the Supreme Court has never allowed defendants to challenge the composition of their grand juries based on the Sixth Amendment." 487 F.3d 379, 387 (6th Cir. 2007).

Lastly, Petitioner's equal protection claim fails because he fails to allege a prima facie case of violation of one's equal protection rights in grand jury selection. To establish an equal protection violation in the context of grand jury selection, "the defendant must show that the procedure employed resulted in substantial underrepresentation of his race or of the identifiable

group to which he belongs." *Castaneda v. Partida*, 430 U.S. 482, 494 (1977). Here, Petitioner provides no data to demonstrate that women, African-Americans, and Hispanics were statistically underrepresented as grand jury foreman over a significant period of time.

As a result, these claims do not satisfy the actual prejudice prong of *Coleman v. Thompson*. 501 U.S. 722, 732 (1991). Petitioner therefore cannot show that post-conviction counsel performed ineffectively in failing to raise these claims and cannot show a reasonable probability that the post-conviction proceedings would have been different had these claims been raised.

### 3. Claim 2 – Securing of Incriminating Statements Without Waiver of Counsel

Petitioner next argues in his Amended Petition that the prosecution violated his Fifth and Sixth Amendment rights, including those under *Massiah v. United States*, 377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964), by using Ms. Taylor to secure statements from Petitioner "after his right to counsel attached but without any knowing, intelligent, and voluntary waiver of the right to counsel, and then using those statements against Petitioner at trial." Docket No. 18, p. 3. Petitioner claims that he received ineffective assistance of trial counsel when his trial counsel "fail[ed] to investigate and challenge this constitutional violation." *Id.* This claim was procedurally defaulted when Petitioner's PCR petition was dismissed as untimely (*See* Docket No. 1; Docket No. 23-18, pp. 5, 95-96); however, Petitioner argues that *Martinez* applies to excuse this procedural default. Docket No. 35, p. 4.

Under *Miranda v. Arizona*, the Fifth Amendment prevents a state from using "statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The question presented, then, is whether Petitioner's statements stemmed from "custodial

interrogation. *Id.* A person is in custody for purposes of *Miranda* when "there was a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994) (quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983)). "'[I]nterrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980). The protections of the Fifth Amendment in interrogations do not extend to interrogations by individuals not known to be affiliated with law enforcement, such as undercover agents. *See Illinois v. Perkins*, 496 U.S. 292, 300, 110 S. Ct. 2394, 110 L. Ed. 2d 243 (1990) (holding that "an undercover law enforcement officer posing as a fellow inmate need not give *Miranda* warnings to an incarcerated suspect before asking questions that may elicit an incriminating response.").

Additionally, the Sixth Amendment guarantees criminal defendants the right "to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The Sixth Amendment's protection attaches "once the adversary judicial process has been initiated" against the defendant. *Montejo v. Louisiana*, 556 U.S. 778, 786, 129 S. Ct. 2079, 173 L. Ed. 2d 955 (2009). Once attached, the defendant has a right to counsel present at all 'critical' stages of the criminal proceedings, including interrogations. *Id.* (citations omitted). The protection afforded by the Sixth Amendment is violated when the State uses "against him at his trial evidence of his own incriminating words . . . deliberately elicited from him after he had been indicted and in the absence of counsel." *Massiah*, 377 U.S. at 206. "The right to counsel applies not only to direct confrontations by known government officers, but also to '*indirect and surreptitious*

*interrogations*' by covert government agents and informants." *Ayers v. Hudson*, 623 F. 3d 301, 309 (6th Cir. 2010) (emphasis original). In order to show a violation of the right to counsel in this context, a petitioner "must demonstrate that the police and their informant took some action, beyond merely listening, that was designed to elicit incriminating remarks." *Kuhlmann v. Wilson*, 477 U.S. 436, 459, 106 S. Ct. 2616, 91 L. Ed. 2d 364 (1986).

If raised by trial counsel, Petitioner's claim would not have entitled him to relief under either the Fifth or Sixth Amendment. First, there is no indication that Ms. Taylor interrogated Petitioner to secure certain incriminating statements, nor does Petitioner allege that Ms. Taylor ever interrogated him. Second, the record does not reflect Ms. Taylor was an agent of law enforcement at the time Petitioner incriminated himself, nor does Petitioner allege that he believed Ms. Taylor was an agent of law enforcement at that time. Without any factual basis to support it, this claim is entirely conclusory and meritless. Thus, Petitioner has failed to show cause to excuse the procedural default of this claim.

#### 4. Claim 3 - Extensive Pretrial Publicity

Petitioner also argues that he was denied a fair trial due to "extensive pre-trial publicity in Montgomery County." Docket No. 18, p. 3. Furthermore, he argues that trial counsel was ineffective in failing to file a motion for change of venue after the trial received this publicity. *Id.* Petitioner raised this claim in post-conviction review, but it was procedurally defaulted when his PCR petition was dismissed as untimely. Docket No. 1; Docket No. 23-18, pp. 5, 95-96. Petitioner argues that *Martinez* applies to excuse this procedural default. Docket No. 35, p. 4.

Regarding the right to a fair trial under the Sixth Amendment, the Supreme Court has emphasized that:

> The Sixth Amendment right to an impartial jury and the due process
> right to a fundamentally fair trial guarantee to criminal defendants a

45

trial in which jurors set aside preconceptions, disregard extrajudicial influences, and decide guilt or innocence "based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *see also Sheppard v. Maxwell*, 384 U.S. 333, 362, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). Community passions, often inflamed by adverse pretrial publicity, can call the integrity of a trial into doubt. In some instances, this Court has observed, the hostility of the community becomes so severe as to give rise to a "presumption of [juror] prejudice." *Patton v. Yount*, 467 U.S. 1025, 1031, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). …The underlying question has always been this: Do we have confidence that the jury's verdict was "induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print?" *Patterson v. Colorado ex rel. Attorney General of Colo.*, 205 U.S. 454, 462, 27 S.Ct. 556, 51 L.Ed. 879 (1907).

*Skilling v. United States*, 561 U.S. 358, 438-39 (2010).

This inquiry is "case specific" and requires a comparison to the Supreme Court's precedent to demonstrate whether a defendant's constitutional rights were safeguarded or infringed. *Id.* at 439. Petitioner has not alleged any facts doing so here. Petitioner only alleges prejudicial pre-trial publicity in a conclusory manner in his amended and pro se petitions. As a result, this claim and his ineffective assistance claim are without merit, and Petitioner cannot demonstrate actual prejudice to excuse this default.

### 5.       Claim 4 - Motion to Sever

In claim 4 of the amended petition, Petitioner argues that trial counsel was ineffective in failing to present a motion to sever defendants. Docket No. 18, p. 4. Petitioner also argues that failing to sever the defendants denied Petitioner a fair trial, which violated the Fourteenth Amendment. *Id.*

Regarding Petitioner's claim that failing to sever the defendants denied a fair trial, it is true that in some cases a failure to sever can violate a defendant's due process rights under the Fourteenth Amendment. *See generally People v. Merriman*, 60 Cal.4th 1 (2014) (noting that

46

joiner can result in gross unfairness and amount to "a denial of defendant's constitutional right to fair trial or due process of law"). Here, however, Petitioner presents no evidence of any prejudice resulting from the joinder of him and his co-defendant Rawny Taylor that would provide a concern of improper joinder. As a result, this claim is also meritless, and Petitioner is also not entitled to relief on this claim.

Regarding Petitioner's claim that trial counsel was ineffective in failing to present a motion to sever, Petitioner has provided no factual support anywhere in the record that indicates that this claim has merit. The only mention of this claim is the single time it is referenced in the amended petition. Docket No. 18, p. 4. As a result, this claim is meritless, and Petitioner is not entitled to relief on this claim.

### 6.      Claim 6 – Lack of Jury Transcript

Petitioner argues that he was prejudiced by trial counsel's "fail[ure] to request a transcript of jury selection to permit appellate and post-conviction review." Docket No. 18, p. 4. As a result, he argues that he was "preclud[ed] [] from thoroughly presenting claims regarding jury selection on appeal." *Id.* Petitioner raised this claim in post-conviction review, but it was procedurally defaulted when his PCR petition was dismissed as untimely. Docket No. 1; Docket No. 23-18, pp. 5, 95-96. Petitioner argues that *Martinez* applies to excuse this procedural default. Docket No. 35, p. 4.

As far as this Court is aware, Petitioner was not barred from seeking transcripts of jury selection when drafting his appeal with his post-conviction counsel. If Petitioner is not able to do so, Petitioner has neither provided this Court evidence that he was incapable of retrieving such records or that reviewing such records would have presented Petitioner with evidence to raise any further grounds for appeal. Absent that, Petitioner cannot show a reasonable probability that the

post-conviction proceedings would have been different had trial counsel requested the records Petitioner references. Accordingly, the procedural default of this ground cannot be excused.

### 7. **Claim 7 - *Batson* Violation and Ineffective Voir Dire**

Petitioner alleges that the prosecution used peremptory strikes to remove African-American jurors in violation of *Batson v. Kentucky*. Docket No. 18, p. 4. Petitioner also alleges that trial counsel was ineffective in conducting voir dire. *Id.* In support of this later argument, Petitioner references seven instances of trial counsel ineffectively conducting voir dire. *See* Docket No. 1, pp. 31-33.

*Batson* provides a three-step inquiry to determine whether a peremptory challenge was based on race:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race[; s]econd, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question[; and t]hird, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Snyder v. Louisiana*, 552 U.S. 472, 476-77 (2008) (internal quotation marks omitted) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 328-29 (2003)).

To establish a prima facie case, and thus satisfy step one of *Batson*, the party challenging the peremptory strike must demonstrate: "(1) he is a member of a cognizable racial group; (2) a peremptory challenge was employed to remove a juror" of a cognizable racial group; and (3) "these facts, along with other relevant circumstances, raise an inference that the proponent of the peremptory challenge used the challenge to exclude a prospective juror because of his or her race." *United States v. McAllister*, 693 F.3d 572, 579 (6th Cir. 2012); *see Powers v. Ohio*, 499 U.S. 400, 402 (1991) (expanding *Batson* to allow criminal defendants to challenge a prosecutor's use of peremptory strikes to remove jurors of any race, not merely jurors of the defendant's race, on Equal

48

Protections Clause grounds).

Here, Petitioner has not satisfied the third requirement of the first step of *Batson*: he has not offered any facts or circumstances which would raise an inference that the challenge was used to exclude the juror because of his or her race. *McAllister*, 693 F.3d at 579. While Petitioner satisfies the first and second requirements of the first step, he does not satisfy the others. Petitioner therefore cannot get his *Batson* inquiry off the ground and cannot excuse the procedural default of this claim.

Regarding Petitioner's claim of counsel's ineffective voir dire, Petitioner provides no evidence to support his claim that trial counsel ineffectively conducted voir dire. His claims in the amended and pro se petitions are conclusory with no factual support. Docket No. 18, pp. 4-5; Docket No. 1, pp. 31-33. As a result, this argument is without merit and the procedural default of this claim cannot be excused.

### 8.       Claim 8 – Introduction of Inflammatory Photographs

Petitioner contends that his trial counsel "was ineffective in failing to prepare and present objections to the introduction of inflammatory, prejudicial, and duplicative photographs" and "[w]itness testimony describ[ing] hemorrhaging in the brain and eyes of the victim." Docket No. 18, p. 5.

Petitioner did not raise this claim in state court—it is raised for the first time in Petitioner's HABEAS petition. *See* Docket No. 23-12; Docket No. 23-18, pp. 1000-32. As a result, this claim is procedurally defaulted. Moreover, state-court remedies are no longer available on this claim due to the statute of limitations and the one-petition rule for filing a petition for post-conviction relief. *See* Tenn. Code Ann. § 40-30-102. And while *Martinez* is mentioned in the Amended Petition, Petitioner makes no specific attempt to argue that *Martinez* excuses the default here. As a result,

the procedural default of this claim cannot be excused.

### 9.    Claim 11 – Failure to Request a Mistrial

Petitioner argues that he received ineffective assistance of counsel when his trial counsel failed to request a mistrial after a government witness "testified as to the presence of a shunt in the victim's head due to previous abuse," even though counsel for the co-defendant objected. Docket No. 18, p. 5. Petitioner further argues that the court's curative instruction was not sufficient. *Id.*

Similar to Claim 8, Petitioner did not raise this claim in state court—it is raised for the first time in Petitioner's HABEAS petition. *See* Docket No. 23-12; Docket No. 23-18, pp. 1000-32. As a result, this claim is procedurally defaulted. Moreover, state-court remedies are no longer available on this claim due to the statute of limitations and the one-petition rule for filing a petition for post-conviction relief. *See* Tenn. Code Ann. § 40-30-102. And while *Martinez* is mentioned in the Amended Petition, Petitioner makes no specific attempt to argue that *Martinez* excuses the default here. As a result, the procedural default of this claim cannot be excused.

### 10.    Claim 21 – Failure to Call Defense Witnesses

Petitioner also asserts that trial counsel was ineffective in "failing to investigate, interview, and potentially call as defense witnesses various individuals who could have provided exculpatory evidence and testified on Petitioner's behalf." Docket No. 18, p. 6. This claim was procedurally defaulted when Petitioner's PCR petition was dismissed as untimely (*See* Docket No. 1; Docket No. 23-18, pp. 5, 95-96); however, Petitioner argues that *Martinez* applies to excuse this procedural default. Docket No. 35, p. 4.

There is no question that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Rayner v. Mills*, 685 F.3d 631, 640 (6th Cir. 2012) (citing *Strickland*, 466 U.S. at 691). But when evaluating counsel's

decisions whether to investigate, a court must "apply[] a heavy measure of deference to counsel's judgments." *Wiggins v. Smith*, 539 U.S. 510, 520, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003) (citing *Strickland*, 466 U.S. at 690-91). When a habeas petitioner predicates an ineffective-assistance-of-counsel claim on a failure to call a witness, he must provide the substance of the missing witnesses' potential testimony. *Clark v. Waller*, 490 F.3d 551, 557 (6th Cir. 2007). Without that, a petitioner cannot establish that his counsel performed deficiently or that he was actually prejudiced. *Id.* (citing *Stewart v. Wolfenbarger*, 468 F.3d 338, 353 (6th Cir. 2006)).

Here, Petitioner has provided the names of 47 witnesses in his initial petition who "were in fact interviewed and provided written interview forms and other information to law enforcement officers" and who he claims would have "rebut[ted] the [P]rosecution's blatant misrepresentations to the jury that only Petitioner could have committed the offenses in this matter." Docket 1, pp. 25-26. Petitioner further claims that his trial counsel "had no legitimate strategic nor tactical reasons" for failing to contact these individuals. *Id.* at 27. This Court disagrees. *Strickland* instructs courts to "presume that trial strategy planned by counsel who spent far more time [than the reviewing Court] examining and planning for a case is sound." *Doria v. Perry*, No. 3:19-cv-562, 2022 WL 2812663, 2022 U.S. Dist. LEXIS 126666, at *19 (M.D. Tenn. July 18, 2022) (citing *Strickland*, 466 U.S. at 689) Trial strategy involves crucial decisions on both what to include and what to *exclude* from a case. In Petitioner's case, trial counsel may have decided the most credible defense would be one which attacked the Prosecutions lack of proof. Further, the evidence that Petitioner resided in a high-crime area, if admitted, would only be relevant to suggest the decedent was the victim of a burglary. Such a theory would have opened the door for the Prosecution to attack the sufficiency and credibility of the Defense's case, which Petitioner's trial counsel could have reasonably foreseen as a greater liability than an asset to Petitioner's case. Whatever the

counsel's motivation, his decision was not unreasonable.

Petitioner cannot show actual prejudice or a fundamental miscarriage of justice from his trial counsel's failure to call various witnesses, nor would he be able to demonstrate a reasonable probability that the proceedings would have been different had counsel done so if he had. Petitioner's procedural default of his claim will not be excused.

### 11.    Claim 13 – Failure to Call an Expert Witness

Petitioner next argues that trial counsel failed to "properly and fully investigate the physical evidence," notably by not enlisting the help of an expert witness. Docket No. 18, p. 6. This argument is two-fold. First, Petitioner asserts that an expert witness could have rebutted the medical testimony of Dr. Adele Lewis, who testified that the cause of death was blunt force trauma. *Id.* Second, Petitioner asserts that an expert witness could have explained "how lighting could be/was used to make bruising appear more prominent in photographs, especially where witnesses testified that bruising was not apparent when they first entered the scene." *Id.* This claim was procedurally defaulted when Petitioner's PCR petition was dismissed as untimely (*See* Docket No. 1; Docket No. 23-18, pp. 5, 95-96); however, Petitioner argues that *Martinez* applies to excuse this procedural default. Docket No. 35, p. 4.

Considering the evidence against Petitioner at trial, Petitioner fails to establish actual prejudice.  First and foremost, Petitioner offers no evidence to suggest that an expert witness could have been obtained to testify favorably for him.  *See Dell v. Straub*, 194. F.Supp.2d 629, 650 (E.D. Mich. 2002) (finding a petitioner failed to demonstrate ineffective assistance of counsel by claiming an expert witness was not called to testify where the petitioner failed to present any testimony that an expert existed who would have given favorable testimony).  If failure to call an expert is not prejudicial enough to constitute prejudice under the *Strickland* standard, it certainly

cannot rise to actual prejudice under *Frady*. Futhermore, Petitioner here fails to excuse default because he cannot show such expert testimony would have changed the outcome of the proceeding. Even if Petitioner had found such an expert, and the expert had testified in Petitioner's favor, a reasonable jury could have still found the expert unconvincing in light of the State's expert witness. The effect a hypothetical Defense expert's testimony would have had on the outcome of his trial is further mitigated by the eyewitness testimony of Petitioner's surviving daughter, who witnessed A.T., Petitioner's daughter, "in the bathroom…getting beatings" from Petitioner before going "back in her room" and turning "all blue." Docket No. 23-5, pp. 46-47, 48. Petitioner has thus failed to establish a constitutional violation or plain error under state law sufficient to find actual prejudice to excuse procedural default of this claim.

### 12.    Claim 14 – Amendment of the Indictment

Petitioner contends that his trial counsel rendered ineffective assistance by "failing to file a motion to dismiss the indictment" after it was amended for trial without presentation to the grand jury. Docket No. 18, p. 6. Petitioner further contends that he was prejudiced in the preparation of appellate and post-conviction motions due to the lack of a transcript of the reading of the charges or instructions to the jury. *Id.* at 6-7. This claim was procedurally defaulted when Petitioner's PCR petition was dismissed as untimely (*See* Docket No. 1; Docket No. 23-18, pp. 5, 95-96); however, Petitioner argues that *Martinez* applies to excuse this procedural default. Docket No. 35, p. 4.

It is a well-established federal rule of law that an indictment may not be amended except by resubmission to the grand jury, unless the change is merely a matter of form. *See, e.g., Russell v. United States*, 369 U.S. 749, 770, 82 S. Ct. 1038, 8 L. Ed. 2d 240 (1962). Petitioner claims the variances between the indictments were "material and prejudicial." Docket No. 18, p. 6. If that were true, it could amount to a violation of Petitioner's right under the Fourteenth Amendment to

due process and equal protections under the law. *Rose v. Mitchell*, 443 U.S. 545, 557 n.7, 99 S. Ct. 2993, 61 L. Ed. 2d 739 (1979) (finding that, although the Constitution does not require states employ grand juries, those that do must comply with the demands of the Fourteenth Amendment in operating those juries).

That said, Petitioner offers only conclusory allegations as support for this argument. Petitioner cites to nothing in concluding the indictment varied in "material and prejudicial" ways. Docket 18, p. 6. A review of the record from the state trial court shows that Petitioner was indicted by two grand juries, first in 2013 and again in 2015. Docket 23-1, pp. 5-14. The final jury instructions for the case list all the portions of the indictment for the charges Petitioner was ultimately found guilty of. Docket 23-2, pp. 15-20. Petitioner was found guilty of Counts One, Two, Three, Four, and Seven, as numbered according to the final jury instructions. Docket 23-2, pp. 48-55. Within the final jury instructions, the trial court judge included the relevant language from the indictment, each of which matches exactly to the language used in the second grand jury indictment. Docket 23-2, pp. 15-20; Docket 23-1, pp. 10-14. The only notable difference lies in the number associated with each charge, which is undoubtedly a matter of form and not substance. *Id.* Petitioner cannot show that post-conviction counsel performed ineffectively in this manner, and because the charges Petitioner was ultimately convicted of were charges which did not change from the language used in the 2015 grand jury indictment. If any further amendments were made to the indictment, they had no effect on Petitioner. As a result, even if Petitioner's counsel had moved for dismissal, and even if he prevailed, Petitioner cannot show any probability that the post-conviction proceedings would have been different. Accordingly, the procedural default of this ground cannot be excused.

With regards to Petitioner's claim that trial counsel's failure to request a transcript of the

reading of the charges or jury instructions, there is similarly no evidence beyond conclusory allegations that trial counsel's failure made any impact on the success of Petitioner's appellate and/or post-conviction motions. The record already contains the Final Jury Instructions (Docket 23-2, pp. 15-46) and, as discussed *supra*, has found no reason to believe they misstate the crimes Petitioner was properly charged with. A transcript of the reading of such charges or jury instruction would therefore only impact Petitioner's ability to present motions on appeal if they contained language which differed substantially from the language contained in the Final Jury Instructions. Such a claim is unlikely given the fact that the transcript of the evidence shows the trial judge charged the jury and both read and provided copies of the instructions to the jury in the presence of Petitioner and his counsel, to no objection. Docket No. 23-7, p. 15. Further, Petitioner has provided the Court with no reason that his counsel on appeal or post-conviction could not have requested such a transcript themselves aside from the claim that "[n]o transcript of the reading of the jury instructions was prepared." Docket No. 18, p. 7. Again, the Court has been provided with no evidence that the Final Jury Instructions in the record do not contain the full and complete set of instructions given to the jury. This Court therefore lacks sufficient evidence to find actual prejudice against Petitioner.

### 13. Claim 15 – Improper Jury Instructions

Petitioner argues that he received ineffective assistance of counsel when his trial counsel failed to object to "improper" jury instructions "that denied Petitioner due process" and "violated Petitioner's constitutional rights." Docket No. 18, p. 7. Specifically, Petitioner argues that the jury should not have been instructed to render its verdict '"as truth and justice dictate.'" *Id.* Petitioner also argues that this instruction was improper:

> Reasonable doubt is that doubt engendered by an investigation of all
> the evidence in the case and an inability, after such investigation, to

let the mind rest easily as to the certainty of guilt. Absolute certainty of guilt is not demanded by the law to convict of any criminal charge, but moral certainty is required, and this certainty is required as to every element of proof necessary to constitute the offense.

*Id.* (quoting Docket 23-2, p. 22)*.* Petitioner contends that these instructions "relieved the prosecution of proving, and the jury from being required to find, Petitioner's guilt and all elements required for conviction beyond a reasonable doubt." *Id.* This claim was procedurally defaulted when Petitioner's PCR petition was dismissed as untimely (*see* Docket No. 1; Docket No. 23-18, pp. 5, 95-96); however, Petitioner argues that *Martinez* applies to excuse this procedural default. Docket No. 35, p. 4.

The Sixth Circuit has previously upheld the constitutionality of "moral certainty of guilt" and "inability to let the mind rest easily about guilt" instructions. *Austin v. Bell*, 126 F. 3d 843, 846 (6th Cir. 1997) (holding that these instructions, given together, do not lower the State's burden of proof). The "as you think justice and truth dictate" instruction has also been held constitutional when it relates "to the verdict representing the considered judgment of each juror." *Morris v. Bell*, No. 07-1084-JDB, 2011 U.S. Dist. LEXIS 155039, 2011 WL 7758570, at *36 (W.D. Tenn. Sept. 29, 2011) (holding that this instruction, when given in this context, "does not give the jury permission to devise its own standard of proof"), *rev'd on other grounds, Morris v. Carpenter*, 802 F.3d 825 (6th Cir. 2015). Here, the "as you think justice and truth dictate" instruction was given in context of the "considered judgment of each juror" instruction, and not in relation to the aforementioned "reasonable doubt" instruction. Thus, this instruction did not unconstitutionally lessen the prosecution's burden.

Neither of these instructions constitute plain error under Tennessee law. The Tennessee Supreme Court has held that "moral certainty of guilt" and "inability to let the mind rest easily about guilt" instructions are constitutional. *State v. Nichols*, 877 S. W. 2d 722, 734 (Tenn. 1994)

(holding that these instructions, when considered in conjunction, "properly reflect[] the evidentiary certainty required by the 'due process' clause of the federal constitution"). The Tennessee Supreme Court has also held that "as you think justice and truth dictate" instructions are constitutional. *State v. Willis*, 496 S. W. 3d 653, 756 (Tenn. 2016) (holding that this "no sympathy" instruction has been previously upheld) (citing *State v. Cribbs*, 967 S. W. 2d 773, 795-96 (Tenn. 1998) and *State v. Bigbee*, 885 S. W. 2d 797, 814 (Tenn. 1994)).

Petitioner has therefore failed to establish a constitutional violation or plain error under state law sufficient to find actual prejudice to excuse the procedural default of this claim.

### 14.    Claim 17 – Failure to Present Mitigation Evidence at Sentencing

Petitioner asserts that trial counsel was ineffective in presenting "absolutely no mitigation evidence at Petitioner's sentencing hearing" and in retaining no mental health professionals or expert witnesses to assist in preparing such evidence. Docket No. 18, p. 8. Petitioner argues that trial counsel should have "fully and adequately investigate[d] Petitioner's mental health and social history to develop and present mitigation evidence." *Id.*

As a preliminary matter, Petitioner's convictions included two counts of Felony First Degree Murder, each carrying a mandatory and automatic sentence of life imprisonment with possibility of parole.  Docket 23-2, p. 59.  This means any attempt to present mitigating evidence would have been fruitless and thus could not have led to a different result at sentencing.  *See Strickland*, 466 U.S. at 695.  It is important to note, however, that Petitioner's trial counsel nonetheless filed a Sentencing Memorandum with the trial court in which he advances two arguments that would reduce Petitioner's effective sentence.  Docket No. 23-2, pp. 58-62.  Petitioner's trial counsel first asserts Petitioner's two Felony First Degree Murder convictions and two convictions for Aggravated Child Abuse and Aggravated Child Neglect should merge. *Id.* at

60.     Second, Petitioner's trial counsel argues that Petitioner's sentences should be served concurrently, not consecutively.  *Id.* at 61-62.

More importantly, Petitioner did not raise this claim in state court—it is raised for the first time in Petitioner's habeas petition. *See* Docket No. 23-12; Docket No. 23-18, pp. 1000-32. As a result, this claim is procedurally defaulted. Moreover, state-court remedies are no longer available on this claim due to the statute of limitations and the one-petition rule for filing a petition for post-conviction relief. *See* Tenn. Code Ann. § 40-30-102. And while *Martinez* is mentioned in the Amended Petition, Petitioner makes no specific attempt to argue that *Martinez* excuses the default here. As a result, the procedural default of this claim cannot be excused.

### 15.     Claim 18 – IAC at Trial and on Motion for New Trial

Petitioner claims that he was prejudiced by trial counsel's deficient performance, and that the performance was so deficient that it violated "prevailing professional norms." Docket No. 18, p. 8. Petitioner further claims that, had counsel performed effectively, Petitioner would not have been convicted; rather, Petitioner would have received a new trial. *Id.* This claim was procedurally defaulted when Petitioner's PCR petition was dismissed as untimely (*See* Docket No. 1; Docket No. 23-18, pp. 5, 95-96); however, Petitioner argues that *Martinez* applies to excuse this procedural default. Docket No. 35, p. 4.

Petitioner's claim is partly a summary of the former ineffective assistance of trial counsel claims made earlier in his petition, and partly a new claim about trial counsel's ineffective assistance in his motion for new trial.  To the extent this claim is merely summarizing the "non-exhaustive list of trial counsel's failures" which came before this claim, it demands no independent analysis.  Petitioner's claim cannot operate as a catch-all; the Court may only consider the claims articulated in the petition, and will not delve into the record to seek out instances of Petitioner's

trial counsel failing to provide effective assistance. To the extent it specifically avers that trial counsel's motion for new trial fell short of prevailing professional norms, Petitioner's claim is both entirely conclusory and unsupported by the record. Petitioner's trial counsel provided five grounds on which he argued the trial court should grant Petitioner a new trial, some of which strongly resemble the claims Petitioner is now making before this Court. Docket 23-2, pp. 72-74. The Court finds Petitioner has failed to establish actual prejudice or a fundamental miscarriage of justice, and thus has failed to show cause to excuse the procedural default of this claim.

### J.      Remaining Claims

#### 1.      Claim 19 - Ineffective Assistance of Appellate Counsel

Petitioner alleges that he "was denied the effective assistance of appellate counsel." Docket No. 18, p. 8. He also alleges that appellate counsel's performance was deficient, and if he received effective performance, he would have obtained relief on appeal and received a new trial on his charges. *Id.* In his pro se petition, Petitioner references several specific instances that he believes indicates counsel's performance was defective. Docket No. 1, p. 34. These include failing to properly communicate all available issues in the case to be asserted on appeal, disregarding the fact the trial transcript was not properly transcribed, and a failure to raise all appellate issues. *Id.*

Petitioner raised this claim on post-conviction review; however, his post-conviction claims were procedurally defaulted when his PCR petition was dismissed as untimely. *See* Docket No. 23-18, pp. 5, 95-96. Petitioner has provided no argument to excuse this default for cause and has accordingly failed to satisfy this requirement. Furthermore, Petitioner has likewise failed to show actual prejudice. As discussed above, the underlying claims regarding whether the transcript was properly described have no merit. The claims regarding communication of issues to be asserted on appeal and a failure to raise all appellate issues are reasonably strategic decisions made by counsel,

which Petitioner has not provided evidence to demonstrate were unreasonable. *See Strickland*, 466 U.S. at 690-91. It thus cannot be maintained that appellate counsel's failure to raise these claims constituted ineffective assistance, as Petitioner cannot satisfy the deficient performance and prejudice prongs of *Strickland* by relying solely on meritless claims. *See id.* At 687. Petitioner therefore cannot show cause or actual prejudice to excuse the procedural default of this claim.

### 2.    Claim 20 - Cumulative Error

In claim 20 of the Amended petition, Petitioner claims that the "cumulative effect of all errors at trial and/or on appeal deprived Petitioner of a fair trial and/or fair direct appeal" in violation of his due process rights under the Fourteenth Amendment. Docket No. 18, p. 9. The Sixth Circuit has held that a cumulative error claim is not a proper basis for habeas relief post-AEDPA. *See Moore v. Parker*, 425 F.3d 250, 256-57 (6th Cir. 2005). Based upon the findings herein, there are no reviewable errors to cumulate and thus petitioner is not entitled to relief on this claim. *See Getsy v. Mitchell*, 495 F.3d 295, 317 (6th Cir. 2007) (*en banc*). Therefore, Petitioner is not entitled to habeas relief based on cumulative error. *See id.*

### 3.    Claim 21 - Incorporation of All Claims

Lastly, in claim 21 of the Amended Petition, Petitioner "incorporates all claims raised in his initial uncounseled habeas petition…to ensure that no claims are in any way unintentionally overlooked or not presented to this Court for review." Docket No. 18, p. 9. As discussed above, Petitioner's pro se petition references his attached PCR petition, which the Court read for purposes of determining whether Petitioner's claims in his amended petition related back to the pro se petition.

The Sixth Circuit has noted that "[g]enerally, amended pleadings supersede original pleadings." *Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 617 (6th Cir. 2014). Yet, the Sixth

Circuit has identified that an amended petition does not supersede an original petition if the "party evinces an intent for the amended pleading to supplement rather than supersede the original pleading." *Braden v. United States*, 817 F.3d 926, 930 (6th Cir. 2016). Still, District Courts "have no obligation to act as counsel or paralegal" to pro se litigants. *Pliler v. Ford*, 542 U.S. 22, 231 (2004). District Courts are also not "required to create" a pro se litigant's claim for him. *Payne v. Sec'y of Treasury*, 73 F. App'x 836, 837 (6th Cir. 2003).

Here, Petitioner clearly states that the amended petition incorporates all claims raised in the pro se petition. Petitioner's pro se petition and attached PCR petition, however, "list[] over 60 claims." Docket No. 5, p. 1. This Court has previously appointed counsel to Petitioner to help Petitioner be "sufficiently precise" in the presentation of his claims because it could not discern whether Petitioner argued claims that he "has not included any discussion in support of." *Id.* at 1. Furthermore, of the numerous claims listed in the PCR petition, many have been addressed above and none have merited relief.

The Court is of the opinion that Petitioner and his counsel would raise all relevant claims in the amended petition. All claims have been reviewed above. As a result, Petitioner is not entitled to relief for any claims raised in other petitions that are not addressed here.

## V.     CONCLUSION

Detention is a matter this Court takes with the utmost seriousness. While granting all due deference to the decisions of state courts, this Court has thoroughly scrutinized the entire record of Petitioner's proceedings. After careful review, and for the reasons discussed above, the Undersigned recommends that habeas corpus relief be **DENIED**.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this

Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute waiver of further appeal of this Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**JEFFERY S. FRENSLEY**
**United States Magistrate Judge**